William BLACKIE et al.,
Defendants-Appellants,

v.

Leonard BARRACK et al.,
Plaintiffs-Appellees.

AMPEX CORPORATION,
Defendant-Appellant,

v.

Benjamin L. KUSHNER,
Plaintiff-Appellee.

William E. ROBERTS and John
Buchan, Defendants-Appellants,

v.

Benjamin L. KUSHNER et al.,
Plaintiffs-Appellees.

TOUCHE ROSS & CO.,
Defendant-Appellant,

v.

Leonard BARRACK et al.,
Plaintiffs-Appellees.

William E. ROBERTS et al.,
Defendants-Appellants,

v.

Leonard BARRACK et al.,
Plaintiffs-Appellees.

Nos. 74–2141, 74–2341, 74–2167,
74–2466 and 74–2648.

United States Court of Appeals,
Ninth Circuit.

Sept. 25, 1975.

Arthur R. Albrecht (argued), McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendants-appellants in No. 74–2141.

David Berger (argued), Leonard Barrack, Gerald J. Rodos (on the brief), Philadelphia, Pa., for plaintiffs-appellees in No. 74–2141.

Theodore P. Lambros (argued), San Francisco, Cal., for defendant-appellant in No. 74–2141.

Stephen V. Bomse (argued), Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendants-appellants in No. 74–2341.

Thomas Elke (argued), San Francisco, Cal., for plaintiff-appellee in Nos. 74–2341 and 74–2648.

William W. Godward (argued), Cooley, Godward, Castro, Huddleson & Tatum, San Francisco, Cal., for defendant-appellant in No. 74–2466.

Melvyn I. Weiss (argued), Milberg & Weiss, New York City, for plaintiff-appellee in Nos. 74–2466 and 74–2648.

Thomas A. H. Hartwell (argued), Cooley, Godward, Castro, Huddleson & Tatum, San Francisco, Cal., for plaintiff-appellee in No. 74–2648.

## OPINION

Before TUTTLE,* KOELSCH and BROWNING, Circuit Judges.

* The Honorable Elbert P. Tuttle, United States Court of Appeals Senior Circuit Judge for the Fifth Circuit, sitting by designation.

KOELSCH, Circuit Judge:

These are appeals from an order conditionally certifying a class in consolidated actions for violation of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.-10(b)–5.

The litigation is a product of the financial troubles of Ampex Corporation. The annual report issued May 2, 1970, for fiscal 1970, reported a profit of $12 million. By January 1972, the company was predicting an estimated $40 million loss for fiscal 1972 (ending April 30, 1972). Two months later the company disclosed the loss would be much larger, in the $80 to $90 million range; finally, in the annual report for fiscal 1972, filed August 3, 1972, the company reported a loss of $90 million, and the company's independent auditors withdrew certifica-

tion of the 1971 financial statements, and declined to certify those for 1972, because of doubts that the loss reported for 1972 was in fact suffered in that year.

Several suits were filed following the 1972 disclosures of Ampex's losses. They were consolidated for pre-trial purposes. The named plaintiffs in the various complaints involved in these appeals[1] purchased Ampex securities during the 27 month period between the release of the 1970 and 1972 annual reports, and seek to represent all purchasers of Ampex securities during the period. The corporation, its principal officers during the period,[2] and the company's independent auditor are named as defendants. The gravamen of all the claims is the misrepresentation by reason of annual and interim reports, press releases and SEC filings of the financial condition of Ampex from the date of the 1970 report until the true condition was disclosed by the announcement of losses in August of 1972.

The plaintiffs moved for class certification shortly after filing their complaints in 1972; after extensive briefing and argument the district judge entered an order on April 11, 1974, conditionally certifying as a class all those who purchased Ampex securities during the 27 month period. The defendants filed notices of appeal from the order of certification on May 9 and 10, 1974.[3]

Additionally, the district judge, in an order entered July 1, 1974, denying a motion made by defendants Roberts and Buchan, and defendants Blackie, et al., for reconsideration of the class certification, permitted those defendants to seek an interlocutory appeal from that order under 28 U.S.C. § 1292(b).[4] We granted

1. The lead action here, the so-called *Molder* action, was originally filed in the Eastern District of Pennsylvania in January of 1972, and transferred to the Northern District of California, where it was consolidated for pretrial with seven other actions. Twelve parties have been allowed to intervene as plaintiffs in the *Molder* action.

2. Appellants Roberts and Buchan terminated their relationship with Ampex during the class

period; the remaining individual defendants were in office throughout the period.

3. The direct appeals are designated Nos. 74–2141, 74–2341, 74–2167, and 74–2466.

4. The district court did not grant permission to appellants Touche and Ampex to seek interlocutory review, as they had not joined in the motion for reconsideration filed before the filing of their notices of appeal. The court assumed that the filing of the notices divested

the petition for interlocutory review.[5] That appeal was designated No. 74–2648, and consolidated with the direct appeals.

In December of 1974, plaintiffs filed a motion to dismiss the various appeals— the purportedly direct appeals on the ground that the certification order is not appealable under 28 U.S.C. § 1291, and the § 1292(b) appeal on the ground that it has been prosecuted in a dilatory manner.

The appeals having now been heard and submitted, we face three issues: 1) whether the order certifying the class is a final order appealable under § 1291; 2) whether the interlocutory appeal should be dismissed; and (if any of the appeals are properly before us) 3) whether the district court order certifying the class was proper under the standards set out in Fed.R.Civ.P. 23(a) and (b)(3). To summarize our decision, we hold the certification order non-appealable and dismiss the direct appeals; we deny the motion to dismiss the § 1292(b) certified appeals; and, *on the merits, hold that the suit may properly be maintained as a class action.*

I. *Appealability under § 1291 of an order granting class action status.*

■ The courts of appeals have jurisdiction over appeals of right under 28 U.S.C. § 1291 only from "final decisions" of the district courts. The statutory limitation is the product of a two-fold policy judgment about judicial administration which was written into the first Judici-

ary Act and adhered to ever since. *See Cobbledick v. United States,* 309 U.S. 323, 324–325, 60 S.Ct. 540, 84 L.Ed. 783 (1940). The requirement saves judicial time by eliminating review of rulings adverse to an eventually successful litigant. But more importantly, the uniform imposition of finality as a condition of review improves the quality of justice administered by the judicial system. On balance, the rule shortens the time needed for resolution of controversies, saving litigants both time and money; "[requiring finality avoids] the obstruction to just claims that would come from permitting the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise, from its initiation to entry of judgment." *Cobbledick, supra,* at 325, 60 S.Ct. at 541. In short, the rule is one of the primary bars against Bleak House Judicial administration;[6] as such, its rationale applies equally to an order certifying a class.

Nevertheless, in some circumstances deferring an appeal practically operates to deny effective review, as the right threatened by an adverse ruling will have been lost in the interim before final disposition of the other aspects of the controversy. The Court therefore has given the § 1291 final decision requirement a "practical rather than a technical construction," *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 548, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949), and allowed interlocutory appeal from a

---

him of jurisdiction over those defendants. We reject Ampex' argument that it is here under § 1292(b) by virtue of its codefendant's interlocutory appeal and its own filing of a notice of appeal under Fed.R.App.P. 4. The taking of an interlocutory appeal requires a discretionary judgment by both the district court and court of appeals—that judgment is exercised with respect to particular parties. As a result, Fed.R.App.P. 5 does not provide, as does Rule 4, for parties to join in others' appeals.

**5.** Thus, whether the standards for certification of such an appeal set out in § 1292(b) were met has been decided, and is not now before us.

**6.** A system of judicial administration, fortunately unknown in this country,

"which has its ruined suitor, with his slipshod heels and threadbare dress, borrowing and begging through the round of every man's acquaintance; which gives to monied might, the means abundantly of wearying out the right; which so exhausts finances, patience, courage, hope; so overthrows the brain and breaks the heart; that there is not an honorable man among its practitioners who would not give—who does not often give—the warning, 'Suffer any wrong that can be done you, rather than come here!'" Dickens, Bleak House, quoted in The World of Law—I, The Law *in* Literature 42 (E. London ed. 1960).

"small class [of orders] which finally determine claims of right separable from and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen*, at 546, 69 S.Ct. at 1225. See *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 170–172, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) *(Eisen IV)*; Note, *Class Action Certification Orders: An Argument for the Defendant's Right to Appeal*, 42 Geo.Wash.L.Rev. 621, 625–628 (1974). Two of the three circuits which have faced the issue have nevertheless held a class certification order non-appealable under *Cohen*. *Thill Securities Corp. v. New York Stock Exchange*, 469 F.2d 14 (7th Cir. 1972); *Walsh v. City of Detroit*, 412 F.2d 226 (6th Cir. 1969). *Accord*, 9 J. Moore, Federal Practice ¶ 110.13[9], at 184–187 (2d ed. 1970).

The Second Circuit, however, has permitted appeal in certain limited circumstances. In *Eisen v. Carlisle & Jacquelin*, 370 F.2d 119 (2d Cir. 1966), *cert. denied*, 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967) *(Eisen I)*, that court recognized that an order denying class action status effectively sounded the "death knell" of the plaintiff's suit. As "no lawyer of competence is going to undertake this complex and costly case to recover $70 for Mr. Eisen," the individual claim could not be adjudicated, and as a practical matter the class question could never be appealed. The court therefore concluded the order was appealable under *Cohen*. We have adopted the death knell doctrine. *Falk v. Dempsey-Tegeler & Co., Inc.*, 472 F.2d 142 (9th

Cir. 1972); *Weingartner v. Union Oil Company of California*, 431 F.2d 26 (9th Cir. 1970).

From that springboard the Second Circuit developed a "reverse death knell" doctrine with respect to a defendant and his rights to foreclose an ostensible class suit against him. Influenced by the suggestion that it consider a rule which would "afford equality of treatment as between plaintiffs and defendants" (*Korn v. Franchard Corp.*, 443 F.2d 1301, 1307 (2d Cir. 1971) (Friendly, J., concurring)), a panel of the circuit held in *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1007 n. 1 (2d Cir. 1973) *(Eisen III)*, that defendants could appeal an order granting class status under three specified conditions. As explicated in *Herbst v. International Telephone and Telegraph Corp.*, 495 F.2d 1308, 1312 (2d Cir. 1974), such an order is appealable when the class determination is " 'fundamental to the further conduct of the case' " (*i. e.*, when, were the class determination reversed, the individual claims presented would be too small to continue the suit, thus effectively terminating it—the reverse death knell situation);[7] when the *order* is " 'separable from the merits;' " and when it will result in " 'irreparable harm to the defendant in terms of time and money spent in defending a huge class action.' " *Herbst*, at 1312, quoting from *Eisen III*, at 1007 n. 1. We are asked, the issue being novel in this circuit, to adopt the Second Circuit's position.[8]

We decline to do so, because we believe that the Second Circuit's rule impermissibly[9] disregards the conditions

---

7. See *General Motors Corp. v. City of New York*, 501 F.2d 639, 645 (2d Cir. 1974); *Kohn v. Royall, Koegal and Wells*, 496 F.2d 1094, 1099 (2d Cir. 1974). *But see General Motors Corp., supra*, at 656–657.

8. Wholly aside from our disagreement with the Second Circuit rule, we doubt that the order involved here would be appealable under that rule. Including intervenors, the named plaintiffs purchased 10,000 shares during the class period and damages would appear to be such that the action would proceed were the order reversed. Thus, criteria 1 may not be satis-

fied. *See, e. g., Falk, supra* (holding individual claim of $14,125 too large to invoke death knell doctrine); *Shayne v. Madison Square Garden Corp.*, 491 F.2d 397 (2d Cir. 1974) (individual claim of $7,482 too large); *Milberg v. Western Pacific R. R.*, 443 F.2d 1301 (2d Cir. 1971) ($8,500 claim too large). Moreover, in this case the second criteria is probably not met either. *See Kohn, supra*, at 1099; *General Motors Corp., supra*, at 646, 659.

9. We recognize that it is not altogether certain that the *Cohen* standards represent the outer parameters of appealability, in light of the

placed on appealability by *Cohen*. The rule of finality is a statutorily imposed restraint on our jurisdiction; as noted, it imposes a legislative judgment that on balance time and money will be saved if appeal is deferred until the conclusion of a suit. We are not free to disregard that judgment; exceptions to uniform application undermine the rule's purpose by fostering litigation about whether an order is exceptional and appealable. And with the proliferation of narrow and peculiar exceptions, the more doubtful and difficult it becomes to determine appealability, at district and appellate court levels, increasingly inviting supposedly foreclosed interlocutory litigation.

In this view and while recognizing that it is nevertheless such an exception, we think the *Cohen* "collateral order" standards should be restrictively construed. The *Cohen* rule is an effort to prevent the inevitable injustices to litigants which result from application of a prophylactic rule which operates "on balance," but only in those limited situations where it can be accomplished with a minimum intrusion on the statutory policy. Thus, *Cohen* requires not only that denial of immediate review result in loss of a right which cannot be sustained by later review, but also that the order appealed from be final and collateral. Thus, even when an injustice may result, immediate review is available only when the appellate court will not be required to duplicate efforts entailed in a later review on the merits, or to review a decision whose tentative nature will render the appellate court's decision fruitless later in the lawsuit.

We are clear that a class certification order does not fall within *Cohen*. The finality condition is not met, as such an order is not a final determination of the propriety of a class. Under Fed.R.Civ.P. 23(c)(1), a class must be certified as soon as practicable after commencement of the action, and is made conditional and subject to alteration, to the creation of sub-classes, Rule 23(c)(4)(B), or indeed to decertification as the suit progresses and newly discovered facts warrant.[10] Nor is the class issue separable from the merits in all cases (including this one). The common questions, typicality, conflicts and adequacy of representation, Fed.R. Civ.P. 23(a), and predominance tests, Fed.R.Civ.P. 23(b)(3), are determinations (unlike, for example, the notice question involved in *Eisen IV*) which may require review of the same facts and the same law presented by review of the merits.[11]

Nor, for that matter, does the order threaten the defendant with any irreparable harm cognizable under *Cohen*. The defendant does not lose any legal rights or entitlement in the interim between certification and appeal—appeal after the litigation fully protects from a judgment for an improper class. *See* Geo.Wash. Note, *supra*, at 628–630.

The Second Circuit found the requisite injury in the increased, and generally irrecoverable, costs of defending the class action. With deference, we disagree. The final decision rule itself often increases the time and cost of litigation.

Court's admonition in that case to give the final decision rule a practical rather than technical construction, and its later observation in *Eisen IV*, 417 U.S. at 170, 94 S.Ct. at 2149, that "[n]o verbal formula yet devised can explain prior finality decisions with unerring accuracy or provide an utterly reliable guide for the future." However, we think those standards were so intended and should be so read, for the same reasons that we think the *Cohen* exception was intended to be narrowly construed, which we set out below.

10. "But we do not mean that every order fixing security is subject to appeal. Here it is the right to security that presents a serious and unsettled question. If the right were admitted or clear and the order involved only an exercise of discretion as to the amount of security, a matter the statute makes subject to reconsideration from time to time, appealability would present a different question." *Cohen*, at 547, 69 S.Ct. at 1226.

11. *See Kohn, supra*, at 1099; *General Motors Corp., supra*, at 659. In fact, as a ruling on class certification must be made soon after commencement of the action, the facts governing the class determination will inevitably be less clear than after the case has gone to judgment.

Denial of immediate review from orders denying motions to dismiss, Fed.R.Civ.P. 12(b)(6), or for summary judgment, Fed. R.Civ.P. 56, may subject a defendant in particular cases to defense costs equivalent to those incurred in defending a class action. Geo.Wash. Note, *supra*, at 629–630; *Kohn v. Royall, Koegel & Wells*, 496 F.2d 1094, 1098–1099 (2d Cir. 1974). Such litigants must bear those costs because of the legislative judgment that a final decision rule will most benefit all litigants, statutorily foreclosing reliance on litigation costs as a justification for departure from the final decision rule.[12]

It strikes us that the Second Circuit rule is the product of three policy considerations, urged on us here as well, which we conclude are insufficient to justify departure from the *Cohen* gloss on the rule.

The first is that litigation costs will be reduced by allowing appeal and thus avoiding the substantial costs of litigating an improperly certified class. While perhaps true in a particular suit, we suspect that the savings envisioned may well prove illusory. Applied to all class actions, the Second Circuit's rule saves time and money only when the appellate court determines the particular class certification order is appealable, when the order would not have been otherwise appealable under the narrower *Cohen* exception, when the district judge would have refused to certify a § 1292(b) appeal, where the district judge would not later decertify the class, and where, on the merits, the order is reversed. Even then, later developments in the suit may lead to reinstatement of the class. To be balanced against savings is the loss of time and money resulting from appeal in which the order is held non-appealable,

or the order is affirmed. Neither we nor (we suggest) the Second Circuit have any way of striking that balance. We can only speculate concerning the various costs, time spans, and percentages which must necessarily be appraised to determine whether the Second Circuit's exception could pay its way; it is ultimately a question which is best suited to legislative investigation and judgment.

Moreover, we would suggest that the number of suits in which a rule of appealability would be worthwhile may be relatively small. The standard of review is abuse of discretion. A number of the criteria set out in Rule 23 relate to matters, such as manageability, adequacy of representation, feasibility of joinder, superiority to other available methods of adjudication, and the like, which are much more within the knowledge of the district court in touch with the litigation than in ours; our review is unlikely to add any superior wisdom, or to reverse on those grounds. In those cases which turn on a question of law, the district judge may certify an interlocutory appeal.[13] The number of cases in which massive litigation costs are threatened, in which a district judge declines to certify an appeal, and which thereafter results in reversal of the class certification, may prove small indeed.

The second consideration is that, because the "death knell" doctrine allows plaintiffs to appeal orders denying class status, parity of treatment requires that defendants be allowed to appeal orders granting such status. We disagree. Precisely the same disparity exists between plaintiffs and defendants with regard to summary judgment or motion to dismiss orders. So long as they are differently situated in a manner relevant to the purposes of the final decision rule,

**12.** Neither *Cohen* nor *Eisen IV* support the Second Circuit in this regard. In both cases the defendant was threatened with costs which the applicable statute placed on the plaintiff. In neither case did the Court rely on general litigation expense to justify appealability.

**13.** Generally an order granting class action status does not involve a controlling question

of law when entered because it has no significant effect on the litigation until issues not pertaining to the personal claims of the class representative have to be decided. Note, *Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b)*, 88 Harv.L.Rev. 607, 630–631 n. 97 (1975).

plaintiffs and defendants may be treated differently. Suffice it here to say that they are differently situated with respect to the finality of the class order— an order denying in the "death knell" situation effectively terminates the suit and precludes presentation of the merits; an order granting does not end the suit, or preclude presentation of the defense, and is subject to reevaluation as well. *See* Geo.Wash. Note, *supra*, at 631–632.

The final consideration relied on by the Second Circuit, *see Herbst, supra,* at 1313, strenuously urged here, is that a class certification order in a large-class, small-claim class action threatens such ruinous liability that the defendant inevitably must settle even frivolous claims, thereby effectively precluding review of the crucial class certification order unless interlocutory review is allowed. Again, we are unpersuaded. In large part the argument is an attack on the decision reflected in Rule 23 to allow integration of numerous small individual claims into a single powerful unit, rather than to an attack peculiarly germane to the operation of the final decision rule in the class action context. Precisely the same power to coerce a settlement (and defeat review of potentially erroneous previous orders) is wielded by any plaintiff with a substantial claim—that fact alone does not generally confer appealability on an order which effectively requires a defense to a large claim. The fairness of the pressure—*i. e.,* the sociological merits of the small claims class action—is not a question for us to decide. The fact is that Congress, by authorizing and approving Rule 23(b)(3), created a vehicle to put small claimants in an economically feasible litigating posture. In that light, we doubt the propriety of an attendant judicial alteration of the final decision rule which immediately (and uniquely) subjects redress of class plaintiffs' claims to the delay and cost of an appeal.

We recognize, of course, that it is the class certification order itself which, if erroneous, creates the improper coercive effect. That is a distinction without a difference unless class certification orders have unique effects specially implicating the policy of the final decision rule. It may well be that a higher percentage of class certification orders are erroneous than others which subject a defendant to the coercion of a large potential liability; or that a higher percentage of frivolous claims are presented in class actions than in others; or that the magnitude of the potential liability in class actions is leading to settlement of more frivolous claims and abandonment of more meritorious appeals, than occurs in other litigation. If such is not the case, there is no reason to treat a class certification order differently than any other interlocutory order. If so, an exception may or may not be justified.[14]

In either event, however, the argument is again properly addressed to Congress. We have no reliable knowledge,[15] and no good means of acquiring any, about the present nature and number of

---

**14.** We note that the supposed *in terrorem* effect of the class certification will persist despite a right of immediate appeal—the claim may be frivolous and the class proper. Immediate appeal will eliminate only the improperly certified coercive class action, at the expense of both frivolous and non-frivolous, property certified classes. It may well be better to attack the "blackmail" problem directly with appropriate safeguards rather than collaterally undermining the final decision rule.

**15.** Both sides have cited extensive commentary, by courts and critics alike, on the supposed *in terrorem* effect of class actions. Almost inevitably those opinions are supported by highly inconclusive, or no, empirical evidence; most of the debate is founded on spec-

ulation, primarily dictated by the writer's personal experience and feelings for or against class actions. The empirical evidence on the subject is very limited, and not particularly helpful because it provides no basis for comparison of class actions with other suits. For what it is worth, however, the empirical evidence indicates that a relatively high proportion of class actions are not settled, but disposed of in defendant's favor on preliminary motions. *See* Committee on Commerce, United States Senate, *Class Action Study*, 93d Cong., 2d Sess. (1974), Committee Print at 9–10. On the basis of the evidence before it, the Commerce Committee concluded that the class action was not a particularly effective vehicle for coercing settlements.

class action settlements, and of how that experience compares with individual lawsuits of the same type, or pressing claims of similar magnitude. Thus, we have no means of deciding whether the present hue and cry of "blackmail" in fact reflects an abnormally high incidence of unfairly coerced settlements, or is rather the pained outcry of defendants whose previously advantaged litigating position has been undermined, and who must now confront small claimants (who have been given the capacity to exert pressure proportionate to the magnitude of the total injury occasioned by defendant's alleged violation of the law) on more equal grounds. Without such knowledge, there is no justification for departure from the "final decision" rule in this context, and we decline to do so.

Consequently, the § 1291 appeals designated Nos. 74–2141, 74–2167, 74–2341 and 74–2466 are dismissed.

## II. *The § 1292(b) interlocutory appeals.*

■ We deny the motion to dismiss the § 1292(b) appeals.

The prosecution of these appeals has not been a model of diligence. Defendants were granted an extension of the time to transmit the record, and three extensions in the briefing schedule. Some of those delays could have been avoided; while the issues involved are somewhat complex, we note that much of the material in the appellate briefs was presented to the trial court, and that the lawyers did not start from scratch here.

■ However, the motion to dismiss is addressed to our discretion, and we think dismissal is not mandated in this case. From the somewhat conflicting representations before us it appears that appel-

lees may have agreed to the extensions, although that acquiescence may have been induced by a now disclaimed representation that plaintiffs could continue with discovery while the case was on appeal. Because the record is hazy, because we have granted the extensions, and because the issues have now been briefed and argued and are ripe for decision, we think the preferable course is for us to decide the appeal and provide guidance to the trial court. However, we do note that one purpose of interlocutory appeals is to hasten the conclusion of a lawsuit, that briefing extensions defeat that purpose, and that in appropriate circumstances we can deny unwarranted extensions and dismiss appeals to prevent an interlocutory appeal from being misused as a dilatory tactic.

We turn to the merits of defendants' Buchan and Roberts, and Blackie, et al., § 1292(b) appeals.

## III. *Compliance with the Requirements of Fed.R.Civ.P. 23(a) and (b)(3).*

### A. *The court's approach to class certification.*

As a preliminary matter, we face the contention that the district judge certified the class in an inappropriate manner. Relying on our opinion in *In re Hotel Telephone Charges,* 500 F.2d 86, 90 (9th Cir. 1974) defendants argue that he improperly engaged in speculation when determining whether a common question exists, and whether conflicts make class representation inadequate, rather than determining, before certifying the class, that the requirements of the Rule were in fact met. We disagree.

■ From a thorough review of the district judge's opinion, we think it apparent that he analyzed the allegations of the complaint [16] and the other materi-

16. In large part appellants' attack on the district judge's approach is a reiteration of their disagreement with his legal conclusions. The speculative language seized upon in the opinion simply conditions the conclusion that a common question exists on plaintiffs' proof of the allegations—*i. e.,* if plaintiffs prove their allegation of X, X will be a question of fact or

law common to the class. Such speculation is entirely proper and necessary. Likewise, the court ruled that any conflicts at present did not appear to defeat adequacy of representation, but that if any unforeseen difficulties arose, they could be cured by sub-classes— again a proper application of the Rule.

al before him (material sufficient to form a reasonable judgment on each requirement), considered the nature and range of proof necessary to establish those allegations, determined as best he was able the future course of the litigation, and then determined that the requirements were met at that time.[17] That is all that is required.

■ Defendants misconceive the showing required to establish a class under *Hotel Telephone Charges.* We indicated there that the judge may not conditionally certify an improper class on the basis of a speculative possibility that it may later meet the requirements. 500 F.2d at 90. However, neither the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule. The district judge is required by Fed.R.Civ.P. 23(c)(1) to determine "as soon as practicable after the commencement of an action brought as a class action . . . whether it is to be so maintained." The Court made clear in *Eisen IV* that that determination does not permit or require a preliminary inquiry into the merits,

417 U.S. at 177–178, 69 S.Ct. 1221; thus the district judge is necessarily bound to some degree of speculation by the uncertain state of the record on which he must rule. An extensive evidentiary showing of the sort requested by defendants is not required. So long as he has sufficient material before him to determine the nature of the allegations, and rule on compliance with the Rule's requirements, and he bases his ruling on that material, his approach cannot be faulted because plaintiffs' proof may fail at trial. Of course, whether he applied correct legal principles in making the ruling, and whether the ruling was within the permissible boundaries of the discretion vested in him, is another question, to which we now turn.

## B. *The merits of class certification.*

■ Defendants question this suit's compliance with each of the various requirements of Rule 23(a) and (b)(3)[18] except numerosity (understandably, as it appears that the class period of 27 months will encompass the purchasers involved in about 120,000 transactions involving some 21,000,000 shares). However, all of defendants' contentions can be resolved by addressing 3 underlying questions: 1) whether a common ques-

---

17. The court is bound to take the substantive allegations of the complaint as true, thus necessarily making the class order speculative in the sense that the plaintiff may be altogether unable to prove his allegations. While the court may not put the plaintiff to preliminary proof of his claim, it does require sufficient information to form a reasonable judgment. Lacking that, the court may request the parties to supplement the pleadings with sufficient material to allow an informed judgment on each of the Rule's requirements.

18. Rule 23 provides in part:
 "(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

 "(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 * * * * * *
 "(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

tion of law or fact unites the class; 2) whether direct individual proof of subjective reliance by each class member is necessary to establish 10b–5 liability in this situation; and 3) whether proof of liability or damages will create conflicts among class members and with named plaintiffs sufficient to make representation inadequate? We turn to the first issue.

1. *Common questions of law or fact.*

The class certified runs from the date Ampex issued its 1970 annual report until the company released its 1972 report 27 months later. Plaintiffs' complaint alleges that the price of the company's stock was artificially inflated because:

> "the annual reports of Ampex for fiscal years 1970 and 1971, various interim reports, press releases and other documents (a) overstated earnings, (b) overstated the value of inventories and other assets, (c) buried expense items and other costs incurred for research and development in inventory, (d) misrepresented the companies' current ratio, (e) failed to establish adequate reserves for receivables, (f) failed to write off certain assets, (g) failed to account for the proposed discontinuation of certain product lines, (h) misrepresented Ampex's prospects for future earnings."

The plaintiffs estimate that there are some 45 documents issued during the period containing the financial reporting complained of, including two annual reports, six quarterly reports, and various press releases and SEC filings.

Because the alleged misrepresentations are contained in a number of different documents, each pertaining to a different period of Ampex's operation, the defendants argue that purchasers throughout the class period do not present common issues of law or fact. They reason that proof of 10b–5 liability will require inspection of the underlying set of facts to determine the falsity of the impression given by any particular accounting item presented; that the underlying facts fluctuate as the business operates (*i. e.*, inventory is bought and sold, accounts are paid off and created); thus, proof of the actionability of a current accounting representation or omission will apply only to those who purchased while a financial report was current; from which they conclude no common question is presented and a class is improper.

We disagree. The overwhelming weight of authority holds that repeated misrepresentations of the sort alleged here satisfy the "common question" requirement. Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit. *See Green v. Wolf Corporation*, 460 F.2d 291, 298 (2d Cir. 1968); *Esplin v. Hirschi*, 402 F.2d 94 (10th Cir. 1968); *Harris v. Palm Springs Alpine Estates*, 329 F.2d 909 (9th Cir. 1964); *U. S. Financial Securities Litigation*, 64 F.R.D. 443 (S.D.Cal. 1974); *Aboudi v. Daroff*, 65 F.R.D. 388 (S.D.N.Y.1974); *Werfel v. Kramarsky*, 61 F.R.D. 674 (S.D.N.Y.1974); *In re Memorex Security Cases*, 61 F.R.D. 88 (N.D. Cal.1973); *Siegel v. Realty Equities Corporation of New York*, 54 F.R.D. 420 (S.D.N.Y.1972); *Herbst v. Able*, 47 F.R.D. 11 (S.D.N.Y.1969); *Dolgow v. Anderson*, 43 F.R.D. 472 (E.D.N.Y.1968); *Siegel v. Chicken Delight, Inc.*, 271 F.Supp. 722 (N.D.Cal.1967); *Fischer v. Kletz*, 41 F.R.D. 377, 381 (S.D.N.Y.1966); *Kronenberg v. Hotel Governor Clinton, Inc.*, 41 F.R.D. 42 (S.D.N.Y.1966). As we stated in *Harris, supra:*

> "Appellees assert that the various investors made payments on the securities at different times and stand in different positions . . . [S]ince the complaint alleges a common course of conduct over the entire period directed against all investors, generally relied upon, and violating common

statutory provisions, it sufficiently appears that the questions common to all investors will be relatively substantial." 329 F.2d at 914.

Those views are consistent with the views of the Advisory Committee on the Rule: "[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action . . . " Advisory Committee on Rule 23, Proposed Amendments to the Rules of Civil Procedure, 39 F.R.D. 69, 103 (1966). The availability of the class action to redress such frauds has been consistently upheld, *see In re Caesars Palace Securities Litigation*, 360 F.Supp. 366, 395–96 (S.D.N.Y.1973), in large part because of the substantial role that the deterrent effect of

class actions plays in accomplishing the objectives of the securities laws. *See* III Loss, Securities Regulation 1819 (2d ed. 1961) ("the ultimate effectiveness of [the security anti-fraud laws] may depend on the applicability of the class action device").

 While the nature of the interrelationship and the degree of similarity which must obtain between different representations in order to come within the outer boundaries of the "common course of conduct" test is somewhat unclear,[19] the test is more than satisfied when a series of financial reports uniformly misrepresent a particular item in the financial statement. In that situation, the misrepresentations are "interrelated, interdependent, and cumulative; "

---

**19.** Because plaintiffs have alleged specific strands of misrepresentation running throughout financial statements of the class period, they are well within whatever the outer boundaries might be, and we need not resolve the issue. We note, however, that a number of courts have apparently held that allegations simply that earnings and stock price have been inflated over a period of time by a defendant's misrepresentations is sufficient to satisfy the common question requirement (although the cases are somewhat unclear because they fail to specify the precise misrepresentations which allegedly inflated earnings). *See Fischer v. Kletz, supra; Kronenberg, supra; Werfel v. Kramarsky, supra. See Feldman v. Lifton*, 64 F.R.D. 539, at 544–545 (S.D.N.Y.1974). Appellants point out that allegation of inflation of earnings or price is conclusionary, and may derive from altogether unrelated misrepresentations. In their view the common question requirement is met only if all purchasers are injured by the same misrepresentation, or, in a "course of conduct" case, by identical repeated misrepresentations, and if defendant's liability can be established by proof both of the same set of facts and same legal principle. We think that is far too restrictive a view of the common question requirement in the securities fraud context. Rule 10b–5 liability is not restricted solely to isolated misrepresentations or omissions; it may also be predicated on a "practice, or course of business which operates . . . as a fraud . . . " Under that section class members may well be united in establishing liability for fraudulently creating an illusion of prosperity and false expectations,

Moreover, even when misrepresentations are unrelated, class members may share a common question of law or fact. Of course, if an early misrepresentation is undissipated, a later purchaser will present a common question even if another misrepresentation has intervened. But even if the effect of the earlier misrepresentation is dissipated, proof of the earlier misrepresentation may be relevant to the latter purchaser's case. Proof of the earlier fraud and its effects might be relevant circumstantially to establish duty standards, culpability, or damages regarding the later fraud; it would establish background information about the defendant common to both suits. Thus, even when unrelated misrepresentations are alleged as part of a common scheme, class members may share common factual questions, and trial in the same forum avoids duplicative proof. That is a major purpose of a class action; the "common question" requirement should be interpreted to obtain that objective. Naturally, when the component misrepresentations of a "course of conduct" fraud are unrelated, a great many more non-common questions exist. In that situation no representative's claim may be typical of the rest of the class, Rule 23(a)(3), although that depends on how broadly that requirement is construed. *See* text at note 25, *infra*, and note 25 *infra*. We think it is for the predominance and other requirements of Rule 23(b)(3), rather than the common question requirement, to function to keep the balance between the economies attained and lost by allowing a class action. The common question requirement should not be restrictively interpreted to attain that objective, particularly as to do so would eliminate the class action deterrent for those who engage in complicated and imaginative rather than straightforward schemes to i .flate stock prices.

"[l]ike standing dominoes . . . one misrepresentation . . . cause[s] subsequent statements to fall into inaccuracy and distortion when considered by themselves or compared with previous misstatements." *Fischer v. Kletz, supra,* at 381.

Precisely such a situation is alleged here in at least three respects—the failure to create adequate reserves for uncollectible accounts receivable and for contractually guaranteed royalty payments, and the overstatement of inventory. The 1972 Annual Report shows writedowns of $31.9 million as provision for royalty guarantees, $11.8 million for uncollectible accounts receivable, and $15 million for inventory. Plaintiffs allege that the writedowns had roots tracing back to the beginning of the class period, an allegation somewhat borne out by the auditors' withdrawal of certification of the 1971 report because of uncertainty that the huge losses reported in 1972 were the product of 1972 business operations, and not attributable to earlier years. Plaintiffs contend that the company's financial reports throughout the period uniformly and fraudulently failed to establish reserves in amounts adequate to satisfy accepted accounting principles, injuring all purchasers of the consequently inflated stock.

In this aspect, plaintiffs allege a source of inflation common to every purchaser. The creation of a reserve is of course simply an adjustment made to the balance sheet and income statement to provide a more realistic view of the business and its operations. Failure in any particular period to recognize that a portion of the accounts receivable generated in that period are uncollectible, and to create or adjust a reserve, will have the effect of inflating the balance sheet assets and surplus, and overstating the income for the period; likewise failure to recognize accrued liabilities for royalty payments will inflate surplus by understating liabilities, and will overstate income. Naturally, any inflation in the stock price due to inadequate reserves will persist until the reserves become adequate or until the losses are in fact written off.

Defendants nevertheless contend that a class is improper because each purchaser must depend on proof of a different set of accounting facts to establish the inadequacy of the reserves at the time he bought. Defendants misconceive the requirement for a class action; all that is required is a common issue of law *or* fact. Even were we to assume that the reserves were at some points during the period adequate, the class members still would be united by a common interest in the application to their unique situation of the accounting and legal principles requiring adequate reserves—*i. e.*, by a common question of law.[20] Here, however, in light of the progressive deterioration of Ampex's financial position and the magnitude of the losses at the end of the period, even the fact that reserves were in reality inadequate throughout much if not all of the period may not be in serious dispute; rather, the question will be whether the inadequacy was in some sense culpable because the contingencies which proved them inadequate were foreseen or foreseeable.

The alleged inventory overvaluation likewise presents common issues. Defendants again contend it does not be-

**20.** Appellants make much of the distinction between an accounting principle and estimate, arguing that the exercise of judgment involved in an estimate depends on analysis of facts which change, making legal evaluation of different estimates distinct legal and factual problems. The distinction makes little sense in this context. The judgment necessary to make an estimate must be controlled by the accounting principle. Thus, even when only detached, unconnected incidents of incorrect estimates are alleged, the jury must neverthe-less be apprised of the common standard of law by which to judge the estimates—the accounting principle—and a common question is presented. Insofar as a class action is involved, the situation is the same as where a consistent misapplication of an accounting principle as part of a course of conduct to inflate the stock price is alleged. And, moreover, it appears to us, contrary to appellants' contentions, that plaintiffs are complaining of abuses of accounting principles, not estimates.

cause the valuation of any particular period's closing inventory involves a process of physical estimation based on that inventory's characteristics, and that overstatement of one period's closing inventory, while overstating that period's income, will have an opposite effect on the next period's income by overstating opening inventory, deflating rather than inflating stock price. While true in the abstract, appellants' position disregards the real substance of the plaintiffs' complaint which is again highlighted by the 1972 Report. In explaining the $15 million writedown, the company stated: "Inventories of stereo tapes more than six months old and more than one year old were written down 50% and 100% respectively . . . No significant writedowns of this nature were made in the prior year."

Plaintiffs thus are complaining of the balance sheet effect of inventory overvaluation. They are alleging that by failing throughout the class period to recognize and account for inventory obsolescence each time the inventory was valued, the company consistently inflated the value at which it carried inventory on the balance sheet.[21] In effect, plaintiffs are complaining of a consistent disregard of the accounting principle that inventory be valued at "lower of cost or market." Again, common questions of law and facts are presented.

The class members also share an interest in establishing the standard of care required of the various defendants under the *White v. Abrams*, 495 F.2d 724 (9th Cir. 1974), flexible duty standard. The flexible duty of any defendant, while depending on his particular relationship to Ampex and to the financial reporting involved, will be owed identically to all market purchasers, who are for practical purposes identically situated. The culpability of each defendant's conduct is to be measured against the statutorily imposed duty not to manipulate the market. Differences in sophistication, etc.,

among purchasers have no bearing in the impersonal market fraud context, because dissemination of false information necessarily translates through market mechanisms into price inflation which harms each purchaser identically. *See U. S. Financial Securities Litigation, supra*, at 451–452.

Moreover, because of the relative similarity of the various documents involved, the duty owed by a defendant with respect to such documents will probably be uniform or nearly so, further uniting the positions of all class purchasers.

2. *Predominance and reliance.*

Defendants contend that any common questions which may exist do not predominate over individual questions of reliance and damages.

The amount of damages is invariably an individual question and does not defeat class action treatment. *E. g., U. S. Financial Securities Litigation, supra*, at 448 n. 5, and cases there cited. Moreover, in this situation we are confident that should the class prevail the amount of price inflation during the period can be charted and the process of computing individual damages will be virtually a mechanical task. *See* n. 24 *infra*.

Individual questions of reliance are likewise not an impediment—subjective reliance is not a distinct element of proof of 10b–5 claims of the type involved in this case.

The class members' substantive claims either are, or can be, cast in omission or non-disclosure terms—the company's financial reporting failed to disclose the need for reserves, conditions reflecting on the value of the inventory, or other facts necessary to make the reported figures not misleading. The Court has recognized that under such circumstances

"involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be

**21.** Whether inflation of assets rather than earnings is material to the stock price is for the jury, not us, to decide.

material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." (citations omitted)

*Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). *See U. S. Financial Securities Litigation, supra,* at 451; *Caesars Palace Securities Litigation, supra,* at 399; *In re Penn Central Securities Litigation,* 347 F.Supp. 1327, 1344 (E.D.Penn.1972).

■■■ Moreover, proof of subjective reliance on particular misrepresentations is unnecessary to establish a 10b–5 claim for a deception inflating the price of stock traded in the open market. *See Herbst v. I. T. T., supra,* at 1315–1316; *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 373–374 (2d Cir. 1973); *Tucker v. Arthur Andersen & Co.,* 67 F.R.D. 468, at 480 (S.D.N.Y.1975); *U. S. Financial Securities Litigation, supra,* at 449–451; *Werfel v. Kramarsky, supra,* at 681; *In re Memorex Security Cases, supra,* at 100–101; *Siegel v. Realty Equities Corporation of New York, supra,* at 424–425; *Herbst v. Able, supra,* at 20. Proof of reliance is adduced to demonstrate the causal connection between the defendant's wrongdoing and the plaintiff's loss. We think causation is adequately established in the impersonal stock exchange context by proof of purchase and of the materiality of misrepresentations, without direct proof of reliance. Materiality circumstantially establishes the reliance of some market traders and hence the inflation in the

stock price—when the purchase is made the causational chain between defendant's conduct and plaintiff's loss is sufficiently established to make out a prima facie case. *See In re Memorex Security Cases, supra,* at 101; Note, *The Reliance Requirement in Private Actions Under SEC Rule 10b–5,* 88 Harv.L.Rev. 584, 593 (1975).

■■■ Defendants argue that proof of causation solely by proof of materiality is inconsistent with the requirement of the traditional fraud action that a plaintiff prove directly both that the reasonable man would have acted on the misrepresentation (materiality), and that he himself acted on it, in order to establish the defendant's responsibility for his loss, which justifies the compensatory recovery.

We disagree. The 10b–5 action remains compensatory; it is not predicated solely on a showing of economic damage (loss causation). We merely recognize that individual "transactional causation" can in these circumstances be inferred from the materiality of the misrepresentation, *see Tucker v. Arthur Andersen & Co., supra,* at 480; *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 381–382 (2d Cir. 1974), and shift to defendant the burden of disproving a prima facie case of causation. Defendants may do so in at least 2 ways: 1) by disproving materiality or by proving that, despite materiality, an insufficient number of traders relied to inflate the price; and 2) by proving that an individual plaintiff purchased despite knowledge of the falsity of a representation, or that he would have, had he known of it.[22]

---

22. A number of cases indicate that proof of materiality raises a "presumption" of reliance. The Court did not speak of a presumption in *Mills* or *Affiliated Ute;* we prefer to recognize that materiality directly establishes causation more likely than not, and that reliance as a separate requirement is simply a milepost on the road to causation. The net result is in either view the same; the validity of either view turns on the assumption that the particular investor is more likely to act like the reasonable investor than not.

There is some debate as to whether the "presumption" of reliance may be rebutted; the general view is that it may be, *see* Harvard Note, *supra,* at 600 and 600 n. 75, and cases there cited, although sound contrary opinion exists. *See Herbst v. ITT, supra,* at 1316 n. 14; *Chris-Craft Industries, Inc., supra,* at 400 (Mansfield, J., concurring and dissenting). The 10b–5 private suit serves a public purpose, but has done so since its judicial creation in the framework of a private damage suit. We doubt the right to disprove causation

That the prima facie case each class member must establish differs from the traditional fraud action, and may, unlike the fraud action, be established by common proof, is irrelevant; although derived from it, the 10b–5 action is not coterminous with a common law fraud action. As we recently recognized in *White v. Abrams*, the fraud action must be and has been flexibly adopted to the overriding purpose of enforcing the Federal securities laws. 495 F.2d at 731. *See Affiliated Ute, supra*, at 151; *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

Here, we eliminate the requirement that plaintiffs prove reliance directly in this context because the requirement imposes an unreasonable and irrelevant evidentiary burden. A purchaser on the stock exchanges may be either unaware of a specific false representation, or may not directly rely on it; he may purchase because of a favorable price trend, price earnings ratio, or some other factor. Nevertheless, he relies generally on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price, and thus indirectly on the truth of the representations underlying the stock price—whether he is aware of it or not, the price he pays reflects material misrepresentations. Requiring direct proof from each purchaser that he relied on a particular representation when purchasing would defeat recovery by those whose reliance was indirect, despite the fact that the causational chain is broken only if the purchaser would have purchased the stock even had he known of the misrepresentation. We decline to leave such open market purchasers unprotected. The statute and rule are designed to foster an expectation that securities markets are free from fraud—an expectation on which purchasers should be able to rely.

will substantially reduce a defendant's liability in the open market fraud context, as we doubt that a defendant would be able to prove in many instances to a jury's satisfaction that a plaintiff was indifferent to a material fraud. Nevertheless, we think the public purpose can be adequately served within the traditional compensatory suit framework by limiting recoveries to those who are in fact injured, and excluding those whom a defendant proves have not been injured, and that 10b–5 suits should continue in that mold until a contrary need appears or until the Court directs otherwise.

The right of rebuttal, however, does not preclude the predominance of common questions. Causation as to each class member is commonly proved more likely than not by materiality. That showing will undoubtedly be conclusive as to most of the class. The fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones; plaintiffs satisfy their burden of showing causation as to each by showing materiality as to all.

The right to disprove causation will not render the action unmanageable. A defendant does not have unlimited rights to discovery against unnamed class members; the suit remains a representative one. *See Clark v. Universal Builders, Inc.*, 501 F.2d 324 (7th Cir. 1974); *Gardner v. Awards Marketing Corporation*, 55 F.R.D. 460 (D.Utah 1972); *Fischer v. Wolfinbarger*, 55 F.R.D. 129 (W.D.Ky.1971). The district judge may reasonably control discovery to keep the suit within manageable bounds, and to prevent fruitless fishing expeditions with little promise of success. He may also exercise discretion in the conduct of the trial, to prevent a time-consuming series of mini-trials on causation, by limiting introduction of repetitive evidence, or by limiting evidence to instances where causation is in doubt; he may also postpone trial of the rebuttal of individual causation until the damage stage of the trial; indeed, he has extensive powers to expedite the suit with procedural innovations. *See* Rule 23(d). We think procedures can be found and used which will provide fairness to the defendants and a genuine resolution of disputed issues while obviating the danger of subverting the class action with delaying and harassing tactics. If not, we may have to reconsider whether to make proof of causation from materiality conclusive, keeping in mind that the Court has directed that the statute be liberally construed to effectuate its remedial purposes, and that that purpose may be served only by allowing an overinclusive recovery to a defrauded class if the unavailability of the class device renders the alternative a grossly underinclusive recovery.

Thus, in this context we think proof of reliance means at most a requirement that plaintiff prove directly that he would have acted differently had he known the true facts. That is a requirement of proof of a speculative negative (I would not have bought had I known) precisely parallel to that held unnecessary in *Affiliated Ute* and *Mills* (I would not have sold had I known). We reject it here for the same reasons. Direct proof would inevitably be somewhat pro-forma, and impose a difficult evidentiary burden, because addressed to a speculative possibility in an area where motivations are complex and difficult to determine. That difficulty threatens to defeat valid claims—implicit in *Affiliated Ute* is a rejection of the burden because it leads to underinclusive recoveries and thereby threatens the enforcement of the securities laws. *See* Harv. Note, *supra*, at 590–91. Here, the requirement is redundant—the same causal nexus can be adequately established indirectly, by proof of materiality coupled with the common sense that a stock purchaser does not ordinarily seek to purchase a loss in the form of artificially inflated stock.[23] Under those circumstances we think it appropriate to eliminate the burden.

Defendants contend that elimination of individual proof of subjective reliance alters and abridges their substantive rights in violation of the Rules Enabling Act, 28 U.S.C. § 2072. The obvious answer is that the standards of proof of causation we have set out apply to all fraud on the market cases, individual as well as class actions. No interpretation of Rule 23 is involved, and the

Rules Enabling Act limitation is not implicated.[24]

### C. *Conflicts.*

Defendants' final major argument is that conflicts among class members preclude class certification. They contend that the interests of class members in proving damages from price inflation (and hence the existence and materiality of misrepresentations subsumed in proving inflation) irreconcilably conflict, because some class members will desire to maximize the inflation existing on a given date while others will desire to minimize it. For example, they posit that a purchaser early in the class period who later sells will desire to maximize the deflation due to an intervening corrective disclosure in order to maximize his out of pocket damages, but in so doing will conflict with his purchaser, who is interested in maximizing the inflation in the price he pays. We agree that class members might at some point during this litigation have differing interests. We altogether disagree, for a spate of reasons, that such potential conflicts afford a valid reason at this time for refusing to certify the class.

Defendants' position depends entirely on adoption of the out of pocket loss measure of damages, rather than a rescissory measure. Under the out of pocket standard each purchaser recovers the difference between the inflated price paid and the value received, plus interest on the difference. If the stock is resold at an inflated price, the purchaser-seller's damages, limited by § 28(a) of the Act, 15 U.S.C. § 78bb(a) to "actual damages," must be diminished by the infla-

---

**23.** *Raschio v. Sinclair*, 486 F.2d 1029 (9th Cir. 1973), is in no way inconsistent with our present position. There we dealt with the statutory "in connection with" requirement, and held that it could not be met as a matter of law when the stock was purchased two months before the allegedly fraudulent representation was made. Here we do not retreat from that position, or from the implicit requirement set out there that there be a reasonable transactional nexus between the fraud

and the loss—we simply amplify on the manner in which that nexus may be proved.

**24.** Indeed, we could, in the exercise of our Article III jurisdiction, transform the 10b–5 suit from its present private compensatory mold by predicating liability to purchasers solely on the materiality of a misrepresentation (*i. e.*, economic damage) regardless of transactional causation, without implicating the Enabling Act limitation.

tion he recovers from his purchaser. Thus, he is interested in proving that some intervening event, such as a corrective release, had diminished the inflation persisting in the stock price when he sold.[25]

While out of pocket loss is the ordinary standard in a 10b–5 suit, *Foster v. Financial Technology, Inc.*, 517 F.2d 1068, at 1071 (9th Cir. 1975); *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir. 1965); *Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 303 F.2d 527 (10th Cir. 1962); *Abrahamson v. Fleschner*, 392 F.Supp. 740, at 746 (S.D.N.Y.1975); *see Sigafus v. Porter*, 179 U.S. 116, 123, 21 S.Ct. 34, 45 L.Ed. 113 (1900); *Smith v. Bolles*, 132 U.S. 125, 10 S.Ct. 39, 33 L.Ed. 279 (1889); Note, *The Measure of Damages in Rule 10b–5 Cases Involving Actively Traded Securities*, 26 Stan.L.Rev. 371, 383–384 (1974); 3 A. Bromberg, Securities Law, Fraud— Rule 10b–5, § 9.1, at 226–227 (1974), it is within the discretion of the district judge in appropriate circumstances to apply a rescissory measure, *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1173 (2d Cir. 1970); *Abrahamson v. Fleschner, supra*, at 746; *see* Stanford Note, *supra*, at 374–376; A. Bromberg, *supra*, at 226, or to allow consequential damages. *Foster, supra*, at 3; *Zeller v. Bogue Elec. Mfg. Co.*, 476 F.2d 795, 802–803 (2d Cir. 1973). It is for the district judge, after becoming aware of the nature of the case, to determine the appropriate measure of damages in the first instance; the

possible creation of potential conflicts by that decision does not render the class inappropriate now. The Rule provides the mechanism of subsequent creation of subclasses, Rule 23(c)(4), to deal with latent conflicts which may surface as the suit progresses. *Green v. Wolf Corporation, supra*, at 299; *Tucker v. Arthur Andersen & Co., supra*, at 482; *Handwerger v. Ginsberg*, CCH Fed.Sec.L.Rep. ¶ 94,934, at 97,241 (S.D.N.Y.1975); *Caesars Palace Securities Litigation, supra*, at 398; *Sol S. Turnoff v. N. V. Nederlandsche Combinatie Voor Chemische Industrie*, 51 F.R.D. 227, 233 (E.D.Pa.1970). As a result, courts have generally declined to consider conflicts, particularly as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit. *See Hawk Industries, Inc. v. Bausch & Lomb, Inc.*, 59 F.R.D. 619 (S.D. N.Y.1973); *Siegel v. Realty Equities Corporation of New York, supra*, at 426.

Here, the conflict, if any, is peripheral, and substantially outweighed by the class members' common interests. Even assuming *arguendo* that the out of pocket standard applies, the class is proper. Every class member shares an overriding common interest in establishing the existence and materiality of misrepresentations. The major portion of the inflation alleged is attributed to causes which allegedly persisted throughout the class period. It will be in the interest of each class member to maximize the inflation from those causes at every point in the

25. Appellants contend that the inflation paid must be measured by the change in price after a corrective release. That drop is of course circumstantial evidence of the inflation when purchased, but it is not the exclusive method of measuring inflation. The fact finder may rely on other methods of determining actual value on the date of purchase, including expert testimony on actual value derived from capitalization of earnings techniques or testimony on book value. Particularly where, as here, the amount of inflation due to absence or insufficiency of reserves may fluctuate, such evidence is necessary in the absence of corrective releases. In any event, the drop after a corrective disclosure will not be conclusive of the amount of original inflation, both because the correction may be only partial (as is alleged of the major corrections involved here), and because the prolonged nature of the fraud introduces other market variables which may affect the amount the market reacted to disclosures at different times during the class period. Stanford Note, *infra*, at 384–385; *Tucker v. Arthur Andersen & Co., supra*, at 482. However, from an appropriate mix of the various methods we are confident that the jury will be able to trace a graph delineating the actual value of the stock throughout the class period. When compared with a comparable graph of the price the stock sold at, the determination of damage will be a mechanical task for each class member.

class period, both to demonstrate the *sine qua non*—liability—and to maximize his own potential damages—the more the stock is inflated, the more every class member stands to recover. Moreover, because the major portion of the inflation is attributed to causes persisting throughout the period, interim corrective disclosures (of which there appear to have been only two or three) do not necessarily bring predisclosure purchasers into conflict with post-disclosure purchasers. Because both share an interest in maximizing overall inflation, the latter purchaser will no doubt strive to show a substantial market effect from disclosure of the lesser (or partial) causes of inflation to maximize the inflation attributable to more serious causes persisting when he bought—a showing which will increase the recovery of the earlier purchaser. In that light, any conflicting interests in tracing fluctuations in inflation during the class period are secondary, and do not bar class litigation to advance predominantly common interests. Courts faced with the same situation have repeatedly, either explicitly or implicitly, rejected defendants' position, for the potential conflict is present in most prolonged classes involving a series of misrepresentations. *See Green v. Wolf Corporation, supra; Tucker v. Arthur Andersen & Co.*, at 475–476 and 476 n. 14, and cases there cited, and at 97,-936; *Aboudi v. Daroff, supra*, at 391–392; *U. S. Financial Securities Litigation, supra*, at 452; *In re Memorex Security Cases, supra; Caesars Palace Securities Litigation, supra; Siegel v. Realty Equities Corporation of New York, supra*, at 426; *Dolgow v. Anderson, supra; Fischer v. Kletz, supra*, at 381–383; *Kronenberg, supra.*

In support of that conclusion, we note that Rule 23 makes no mention of conflicts. The Rule's requirements are that the representative's claims be "typical" and that the class be "fairly and adequately" represented—claims need not be coextensive. *Caesars Palace Securities Litigation, supra*, at 397. Those requirements are in part constitutionally dictated, as due process requires, in order to give collateral res judicata effect to a judgment against class members, that their interests have been adequately represented in the class action. *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940).

*Hansberry* does not, however, as defendants seem to assume, dictate that any divergence of interest among class members violates due process (thereby necessarily requiring an identity of interests to satisfy Rule 23's adequacy or representation and typicality requirements). Neither the Rule's requirements nor those of due process are so inflexible. The due process touchstone of adequacy and fairness of representation (*see In re Four Seasons Securities Laws Litigation*, 502 F.2d 834, 842 (10th Cir. 1974); *Eisen IV*, at 177) must be judged in light of the seriousness and extent of conflicts involved compared to the importance of issues uniting the class; the alternatives to class representation available;[26] the procedures available to limit and prevent unfairness; and any other facts bearing on the fairness with which the absent class member is represented.

*Hansberry* is not controlling here—in *Hansberry* there was nothing to satisfy due process. Not only were the members of the purported class of property owners diametrically opposed on the cen-

---

**26.** The rule requires adequate representation. The alternative may be none at all.

"The basic concept of commonality, a requirement which is prevalent throughout Rule 23 and is premised upon a fundamental recognition that representatives of a class must have interests which are not in opposition to the members of that class, must be interpreted to best effectuate the primary purposes of the class action device, i. e., to give small investors a reasonable opportunity to vindicate their claims in a manner which will not place an undue burden upon them. It is in this light that we must approach the defendants' objections to the instant class actions under Rule 23(a)(3)." *Caesars Palace Securities Litigation, supra*, at 397–398.

tral issue—the validity of racial covenants restricting their property—but the state class action procedure provided absent class members no notice. Here, on the other hand, under the notice and opt-out procedure of Rule 23(b)(3) and 23(c)(2), an absent class member may evaluate his position in the class and decide for himself whether to avail himself of the representation offered. *See, e. g., Four Seasons Securities Laws Litigation, supra,* at 842–844; *Herbst v. Able, supra,* at 15. The potential conflicts are at most peripheral. And the district judge will retain constant supervision, through his powers under Rule 23(d) and (e), and through his ability to decertify or create sub-classes, to assure fairness of representation. *See Dolgow v. Anderson, supra,* at 496. Finally, and unlike numerous cases in which even one representative has been held adequate to represent a prolonged class, the class members here will be represented by numerous named representatives, with substantial personal stakes, who purchased throughout the class period, and who thus will probably represent whatever conflicting interests there are in the development of plaintiffs' trial strategies. In light of those various factors, we agree with the district judge that the class representatives are typical and will adequately and fairly represent the class.[27]

Affirmed.

---

27. We likewise reject the contention that conflicts between debenture holders and shareholders require decertification at this time; *see Handswerger v. Ginsberg, supra,* at 97, 240–97, 241; *Caesars Palace Securities Litigation, supra,* at 398–399; *Fischer v. Kletz, supra,* at 384; or that present shareholders and those purchasers who have sold their shares irreconcilably conflict. *See Handswerger, supra,* at 97, 240 n. 3; *Herbst v. ITT, supra,* at 1314; *Herbst v. Able, supra,* at 15.