Mary AMADOR, et al., Plaintiffs,

v.

Sheriff Leroy D. BACA,
et al., Defendants.

No. CV 10–1649 SVW (JEM).

United States District Court,
C.D. California.

Signed March 12, 2014.

amended complaints." Settlement Agreement, Recital ¶ C.

Barrett S. Litt, Lindsay Brooke Battles, Kaye McLane Bednarski and Litt, Pasadena, CA, Colleen Flynn, Law Office of Colleen Flynn, Cynthia M. Anderson–Barker, Cynthia M. Anderson–Barker Law Offices, Donald Webster Cook, Law Firm of Mann and Cook, Robert Frederick Mann, Mann and Cook, Los Angeles, CA, for Plaintiffs.

Daniel Lee, David D. Lawrence, Jin S. Choi, Justin W. Clark, Paul B. Beach, Lawrence Beach Allen and Choi PC, Glendale, CA, for Defendants.

## ORDER RE: MOTION FOR CLASS CERTIFICATION [193]

STEPHEN V. WILSON, District Judge.

## I. INTRODUCTION

Plaintiffs' Second Amended Complaint ("SAC") seeks injunctive relief and monetary damages for allegedly unconstitutional strip search procedures at defendants' Century Regional Detention Facility ("CRDF") in Lynwood, California. (Dkt. 109.) Plaintiffs move for certification of an injunctive relief class under Federal Rule of Civil Procedure 23(b)(2) of all "present or future women inmates of the LA County Jail who, upon their admission or return to CRDF from outside of CRDF, are being or will be strip/visual body cavity searched in a group, with other inmates, in an outside bus stall." Plaintiffs also request certification of a similarly defined damages class under Rule 23(b)(3) of all women who have been subjected to this strip-search procedure.

## II. LEGAL STANDARD

■ "[A]n essential prerequisite of an action under Rule 23 is that there must be a 'class'." Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1760, at 134 (3d ed. 2005). "A class definition should be precise, objective, and presently ascertainable." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D.Cal.1998) (citation and internal quotation marks omitted); *accord Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504 (C.D.Cal.2012). However, "the class does not have to be so ascertainable that every member can be identified at the commencement of the action." Wright, Miller & Kane § 1760, at 136. Rather, "[i]f the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist." *Id.* at 136–37. A class is "sufficiently defined and ascertainable if it is administratively feasible for the court to determine whether a particular individual is a member." *Keegan*, 284 F.R.D. at 521 (citation and internal quotation marks omitted).

■ To obtain certification of their proposed classes, plaintiffs bear the burden of establishing each of the four requirements of Federal Rule of Civil Procedure 23(a), together with at least one of the requirements of Rule 23(b). *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir.2011).

■ The four Rule 23(a) requirements are numerosity, commonality, typicality, and adequacy, *i.e.*, (1) the class is so large that joinder of all the members under Rule 19 is impracticable; (2) there are one or more questions of law or fact common to the class; (3) the named parties' claims are typical of the class; and (4) the class representatives will fairly and adequately protect the interests of other members of the class. Fed. R.Civ.P. 23(a); *Ellis*, 657 F.3d at 980. The Court must perform "a rigorous analysis [to ensure] that the prerequisites of Rule 23(a) have been satisfied." *Wal–Mart Stores v. Dukes*, —— U.S. ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) (citation and internal quotation marks omitted). The plaintiff must prove that the proposed class presents common questions of law or fact. *Id.* at 2550–51. In other words, the class members' claims "must depend upon a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551.

■ Plaintiffs seek certification of an injunctive relief class and a damages class. An action for classwide injunctive relief is authorized by Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). Certification of a subsection (b)(2) class "is appropriate only where the primary relief sought is declaratory or injunctive." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir.2001), *amended by* 273 F.3d 1266 (9th Cir.2001). Certification of a damages class under subsection (b)(3) requires a different analysis. The plaintiffs must establish that (1) "questions of law or fact common to class members predominate over any questions affecting only individual

members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

## III. DISCUSSION

### A. Class Definition

Plaintiffs propose a damages class of "women in the custody of LA County Jail who, upon their admission or return to CRDF from outside of CRDF, until the time the practice stops or a date set for the verdict cutoff in this case, were strip/visual body cavity searched in a group, with other inmates, in an outside bus stall." (Dkt. 193 at 2.) They propose a similarly defined class for the injunctive relief claim. These are clearly defined and readily ascertainable classes. It is undisputed that membership in the damages class can be determined from CRDF prison records. *Cf. Keegan,* 284 F.R.D. at 521–22 (class was ascertainable where membership could be verified by readily available documentation).

### B. Rule 23(a) Requirements

Plaintiffs have the burden of demonstrating that their proposed classes meet Rule 23(a)'s four requirements of numerosity, commonality, typicality, and adequacy. *Zinser,* 253 F.3d at 1186. Defendants do not dispute numerosity. They dispute the adequacy of the named plaintiffs to represent the proposed injunctive class, but do not dispute the adequacy of the proposed representatives of the damages class. Defendants' main argument against certifying both classes is that plaintiffs have not demonstrated that there is a "common question of law or fact" sufficient to satisfy Rule 23(a)'s commonality and typicality requirements.

#### 1. Commonality & Typicality

Plaintiffs assert that the common question of law or fact in this case is "whether Defendants had a custom, pattern and practice of routinely strip searching inmates returning from outside the jail under unconstitutional conditions." (Dkt. 207: Reply at 12.) However, "it is insufficient to merely allege any common question. . . ." *Ellis,* 657 F.3d at 981; *Wal–Mart,* 131 S.Ct. at 2551 ("[A]ny compe-

tently crafted class complaint literally raises common questions.") (citation and internal quotation marks omitted). The concept of "unconstitutional conditions" potentially encompasses many disparate conditions. "Thus stated, the common question is too broad." *Parsons v. Ryan,* 289 F.R.D. 513, 516 (D.Ariz.2013) (class of all Arizona prisoners receiving medical care proposed common question to be "whether Defendants are deliberately indifferent to their health and safety in violation of the Eighth Amendment").

■ *Wal–Mart* established that simply formulating a common question is not enough to satisfy Rule 23(a). *Wal–Mart,* 131 S.Ct. at 2551. Instead, "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered *the same injury.*" *Id.* (emphasis added, citation and internal quotation marks omitted). The fact that the class members may have "all suffered a violation of the same provision of law"—such as the Fourth Amendment right to be free of unreasonable searches or the Eighth Amendment right to be free from cruel or unusual punishments—does not necessarily mean that all the class members' claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution. . . ." *Id.* Different strip searches could violate the Fourth Amendment in different ways. *Cf. id.* at 2551 (Title VII "can be violated in many ways . . . [so] the mere claim by employees of the same company that they have suffered a Title VII injury . . . gives no cause to believe that all their claims can productively be litigated at once."). Nevertheless, not all questions of fact and law must be common to satisfy Rule 23(a)(2). *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir.1998). "The existence of shared legal issues with *divergent factual predicates* is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* (emphasis added); *accord Meyer v. Portfolio Recovery Assocs.,* 707 F.3d 1036, 1041–42 (9th Cir. 2012) (reiterating *Hanlon* in light of *Wal–Mart* ), *cert. denied,* — U.S. ——, 133 S.Ct. 2361, 185 L.Ed.2d 1068 (2013).

*Wal–Mart* makes clear, however, that whatever divergent factual predicates may underlie individual class members' claims must be sufficiently similar that "[t]he common contention must be 'capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Meyer,* 707 F.3d at 1041–42 (quoting *Wal–Mart,* 131 S.Ct. at 2551). "What matters to class certification is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wang v. Chinese Daily News, Inc.,* 737 F.3d 538, 543 (9th Cir.2013) (quoting *Wal–Mart,* 131 S.Ct. at 2551). Accordingly, when considering a motion for class certification, the Court must "'determine whether there was a common pattern and practice that could affect the class as a whole.'" *Id.* at 544 (quoting *Ellis,* 657 F.3d at 983). In the present case, that question is whether the conditions experienced by all the class members during the strip searches were substantially the same, so that the issue of the constitutionality of these conditions can be resolved "in one stroke." *Wal–Mart,* 131 S.Ct. at 2551.

Assessing commonality frequently requires an examination of the merits of a plaintiff's claims. *Id.* at 2551–52; *Ellis,* 657 F.3d at 981–82. Here, the issue of commonality and typicality overlaps with plaintiffs' claims about the manner in which new or returning inmates were strip searched at CRDF. *Wal–Mart* described two ways in which a plaintiff might be able to establish that her own injury from a defendant's behavior is shared by "'a class of persons who have suffered the same injury.'" *Wal–Mart,* 131 S.Ct. at 2553 (quoting *General Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 157–58, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). First, if the defendant routinely applied a particular procedure to every potential class member, then the legality of that procedure would present a common question under Rule 23(a). Second, in the absence of a routine procedure, a plaintiff can establish commonality by presenting "significant proof" that the defendant behaved in accordance with a "general policy" that was illegal. *Id.* Regardless of the method of proof employed, "[i]f there is no evidence that the entire class was subject to the same allegedly [unlawful practice or policy], there is no question common to the class." *Ellis,* 657 F.3d at 983.

As described below, there is substantial evidence that all strip searches as CRDF are conducted according to a standard procedure under conditions that in many respects are the same for all inmates, while at the same time there are numerous variations in individual inmates' experiences of being strip searched. Thus, commonality has been established as to *some* of the conditions that plaintiffs claim contribute to the unconstitutionality of the manner in which the strip searches are performed, but it has not been established as to *all* of the purportedly relevant conditions.

### (a) Common Conditions During Strip Searches

Many aspects of the strip search are undisputed. Women who enter and exit CRDF are strip searched in Bus Bay 3, at least when the temperature in the area is above 68 degrees Fahrenheit. Buses carrying inmates enter the bay through a metal garage door that is rolled down while the searches are performed. However, the wall opposite this garage door is shared with CRDF's reception center; a large mechanical door provides access between Bus Bay 3 and the reception center. During strip searches, this door often remains open, blocked only by large laundry carts. Instead of a roof, the top of the bay is a chain link fence that is currently covered by a tarp. One side of the bay is cinderblock; the other side is currently partially covered by wood panels (which extend high enough to block the view from the adjacent bus bay), with tarps hanging above these panels that cover a portion of the side of the bay. The floor is porous gray cement.

There is also little dispute about the strip search procedure. The women are strip-searched in groups of up to sixty people. They are not permitted to speak during the searches unless instructed to. They are told not to look in any direction except forward.

At the beginning of each strip search, a group of fully clothed inmates is escorted in a straight line into Bus Bay 3 and told to stand with their left shoulders against the cinder-block wall. They are then told to face the wall, and stand "shoulder to shoulder." [1] Inmates are instructed to place any personal belongings that they have on their person— e.g., court papers and toiletries—in their hands behind their backs. Deputies then search this property for contraband and place it on the floor behind each inmate. Inmates are then instructed to remove their outer garments—shoes, socks, pants, and shirts—and hold them behind their backs. Deputies search these items for contraband and place them on the ground behind each inmate with her personal property. Inmates are then told to lift the back of their hair, so that deputies can see their hair and neckline.

Inmates are then told to turn around towards the deputies and run their fingers along the bands of their underwear and bras. Inmates with large folds of skin or large breasts are told to lift them so that deputies can confirm that no contraband is tucked underneath. Inmates are also told to open their mouths and roll their tongues around so that deputies can confirm that there is no contraband inside. At this point, inmates are told to turn back towards the wall, facing away from the deputies. They are instructed to lower their underwear to their knees. They are then required to bend over and look back through their legs, spread their body openings, and cough, so that each deputy can visually inspect their body cavities. Next, they are ordered to reach behind their bodies and use their hands to spread apart their buttocks and their labia. After each inmate is inspected, she is told to get dressed, gather her belongings, and stand in line with her shoulder to the wall while waiting to be escorted into CRDF.

The women are instructed to line up on both sides of Bus Bay 3, so that while facing the interior, they are in plain view of each other. Moreover, when they are told to bend over and look through their legs and manipulate their buttocks and labia, they cannot avoid seeing the women across from them doing the same thing. Defendants do not dispute plaintiffs' assertion that inmates are often lined up against the walls across from one another, and plaintiffs concede that this does not always occur.

Nor do the parties dispute how CRDF searches menstruating women. After all the women have stripped down to their underwear, those who are menstruating are told to raise their hands; those who do are distributed boxes containing clean sanitary napkins and told to remove the napkin from the box and place it on their pile of clothing. Inmates must then remove their soiled tampon or pad, place it in the empty box, and throw the box on the ground or into a trash bag. Inmates must then wait until the genital search process is complete before they may replace the soiled pad or tampon with the clean one.[2] During this time, inmates often bleed on themselves or on the ground in view of the deputies and other inmates. While it is obvious that not all members of the proposed class were subjected to a visual body cavity search while they were menstruating, these factual disparities relate more to the question of preponderance and damages under Rule 23(b)(3) than to the question of whether the defendants' standard protocol for conducting the searches is unconstitutional. *Cf. Mazza v. American Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir.2012) (where different car buyers saw different advertisements, individual questions regarding materiality of omissions related to issue of preponderance under Rule 23(b)(3), not commonality under Rule 23(a)(2)); *Hanlon*, 150

---

1. Defendants argue that, under Los Angeles Sheriff's Department (LASD) policy, the inmates are required to stand with space between them so that their shoulders do not touch. Plaintiffs have submitted declarations stating that inmates often stand close enough to touch shoulders or hips.

2. Although defendants dispute the amount of time that any woman must stand naked without a tampon or sanitary napkin in place, they do not dispute that the strip search procedures require women to remove their pad, then bend over, and wait for a guard to inspect them as part of the entire group. Defendants do not contend that menstruating women are searched immediately after being given a clean sanitary napkin.

F.3d at 1019 ("All questions of fact and law need not be common to satisfy the rule.").

### (b) Uncommon Conditions During Strip Searches

██ In contrast to the common procedures described above, there are several alleged conditions of the strip searches as to which plaintiffs have failed to provide significant proof that they form a part of defendants' routine pattern and practice. First, plaintiffs argue that the floor of Bus Bay 3 is kept in a filthy condition—that the floor upon which inmates must stand barefoot is covered with bodily fluids, oil spots, bird droppings, and insects. The only proof offered in support of this contention are 168 declarations from former CRDF inmates, many of which describe the condition of the floor as "sticky" and "scummy," oil-stained, and covered with insects. In opposition, defendants provide declarations from seven deputies who have been assigned to CRDF and are familiar with the policies and procedures in place there. These deputies state that, after each strip search in Bus Bay 3, the entire bay is cleaned, trash is picked up, and disinfectants are applied. They further state that the floor is bleached and sanitized with "various disinfectants and specialized cleaning agents that are designed to eliminate and prevent viral infestations."

In light of these declarations, plaintiffs' 168 declarations fall short of the "significant proof" required to show that defendants had a pattern and practice of strip searching CRDF inmates on an unsanitary floor. Plaintiffs seek to certify a class that would number "in the tens of thousands." (Mot. at 22.) Even if the class were as small as 10,000 inmates, plaintiffs' declarations would represent just 1.7% of the class.[3] Of greater significance than the ratio of declarations to class members, however, is the absence of any evidence tending to indicate that the declarations submitted in support of class certification is a statistically reliable indicator of a regular practice at CRDF. Plaintiffs have submitted no evidence that their declarants were selected according to a statistically valid sampling procedure, and no evidence concerning the level of confidence with which extrapolations to the entire class can be drawn. *Cf. Wal–Mart,* 131 S.Ct. at 2556 (contrasting plaintiffs' inadequate statistical showing with case in which pattern of discrimination was shown by affidavits of 12.5% of class drawn from representative cross-section). Moreover, not all of the declarations state that the floor was unsanitary, further undermining plaintiffs' contention that defendants had a policy and practice of strip-searching individuals on an unsanitary floor. *Cf. id.* ("Even if every single one of these accounts [in plaintiffs' affidavits concerning 235 Wal–Mart stores] is true, that would not demonstrate that the entire company [with 3,400 stores] operates under a general policy of discrimination . . . .") (citation and internal quotation marks omitted).

██ Similarly, plaintiffs have failed to meet their burden of providing "significant proof" that defendants had a pattern and practice of subjecting inmates to demeaning and abusive language during strip searches, allowing inmates to be seen by people inside the CRDF facility (including male employees), or requiring inmates to insert their fingers into their mouths after touching other body cavities. With respect to these alleged conditions of the searches, plaintiffs rely entirely on the 168 declarations. Although approximately 75% of the declarations include these allegations, the other 25% do not.[4] In

---

3. The Court does not intend to suggest that there is some threshold ratio that must be reached to provide "substantial proof" of a common practice. The Supreme Court did not address the contours of the "substantial proof" requirement in *Wal–Mart,* and did not imply that proponents of class certification must produce declarations from a majority of the members of a large class, or any particular percentage of them. *See Wal–Mart,* 131 S.Ct. at 2556 (citing *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) as example of case in which affidavits from 12.5% of employees was sufficient

to establish company-wide discriminatory practice).

4. The Court's review of the 26 narrative declarations (Exs. 700–726) and the 142 declarations verifying questionnaires (Exs. 800–942) indicates that 121 declarants referred to the use of obscene or abusive language, 126 declarants said that people outside the bus bay could see in, and 121 declarants described touching their mouths after touching other body cavities.

contrast to this somewhat inconsistent evidence, the deputies' declarations state that the search process is "specifically designed so that inmates first touch their heads and upper bodies before they touch the lower portions of their bodies," and written LASD policy provides that searches are "not to be used to inflict physical stress or punishment on inmates," and "shall be performed in a respectful manner."

There is significant variation among the declarations alleging that deputies used abusive or demeaning language. Many declarations describe deputies using obscene words in the course of giving otherwise presumptively legitimate commands, but do not allege that deputies made demeaning comments about inmates' anatomy or appearance. (*See, e.g.,* Ex. 702 ¶ 4 ("During the search, deputies are using the word 'fuck' frequently and other swear words."); Ex. 714 ¶ 10 ("The guards routinely gave instructions using abusive and profane language."); Ex. 808–003; Ex. 894–007; Ex. 911–008.) Other declarations, however, assert not only that deputies laced their commands with profanity, but that they "laughed [at naked inmates], making jokes about the appearance of their bodies and how the area smelled." (Ex. 713 ¶ 7; *see, e.g.,* Ex. 704 ¶¶ 25–27; Ex. 717 ¶ 7; Ex. 720 ¶ 9; Ex. 723 ¶ 18; Ex. 724 ¶¶ 15–16; Ex. 726 ¶ 7.) The deputies acknowledge that CRDF staff sometimes "use very direct, stern statements to inmates during the search process," but assert they usually do so because an inmate is not following instructions, or because they need to conduct the searches quickly. They claim that making demeaning statements during strip searches is contrary to LASD policy and "would expose the offending employees to discipline by the Department."

Even assuming that plaintiffs' declarations are accurate and representative, it is evident that deputies speak to inmates in various different ways, including giving direct orders without using objectionable language, using profanity when giving otherwise legitimate commands, and making demeaning comments to specific individuals in a deliberately humiliating manner. (*See* Ex. 700 ¶ 29 ("I am fearful of getting a deputy who is in a bad mood."); Ex. 898–08 (listing seven deputies present during strip searches and claiming two of them made comments); Ex. 901–009 ("[A]fter going in and out so often you get used to it and just comply to breeze through it without any problems from the deputies."); *see also* Ex. 700 ¶ 27 (describing multiple deputies simultaneously screaming at inmates to comply with search "so that no one can hear what any of the deputies are saying"). Thus, it cannot be concluded that generalized "verbal abuse" alleged by plaintiffs forms a part of the *regular conditions* common to all searches at CRDF. *Cf. Gonzalez v. Millard Mall Services, Inc.,* 281 F.R.D. 455, 462 (S.D.Cal.2012) (plaintiff employees failed to show common policy in entire company where individual plant managers exercised discretion in setting employees' schedules). Moreover, determining whether deputies' language contributed to the unconstitutionality of the manner in which the searches were conducted could depend on whether deputies were simply swearing while barking commands or were instead aiming humiliating remarks at inmates. Therefore, the question of whether "verbal abuse" contributes to the unconstitutionality of the standard search procedure at CRDF does not present a "common contention ... capable of classwide resolution." *Wal–Mart,* 131 S.Ct. at 2551.

■ Nor have plaintiffs met their burden of providing significant proof that defendants had a pattern and practice of failing to provide accommodations to inmates with physical disabilities. Only 24% of plaintiffs' declarations describe failures to accommodate the needs of disabled inmates.[5] In contrast, the deputies' declarations state that disabled inmates "are accommodated on a case by case basis, depending upon the individual abilities and needs of the inmate." This is to be expected. *Cf. Nunes v. Wal–Mart Stores, Inc.,* 164 F.3d 1243, 1247 (9th Cir.1999) (rea-

---

**5.** Forty-one of plaintiffs' 168 declarations described failures to accommodate women with disabilities.

sonableness of disability accommodation "requires a fact-specific, individualized inquiry").

For these reasons, the Court finds that while there is evidence that the entire class was subject to the same allegedly unlawful practice or policy during the searches in certain respects, the entire class was not subject to the same conditions with respect to the cleanliness of the floor, verbal abuse, outside viewers, the order in which body cavities were probed, and the accommodation of disabilities. These latter complaints do not present a "question common to the class." *Ellis*, 657 F.3d at 983; *cf. Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 497–98 (7th Cir.2012) (While the generic question of whether a school district fulfilled its obligations to accommodate disabled children "is surely a part of both children's claims, it must be answered separately for each child based on individualized questions of fact and law, and the answers are unique to each child's particular situation.").

### 2. Adequacy of Representatives for Injunctive Relief Class

■ Defendants argue that a Rule 23(b)(2) class cannot be certified because the proposed representative plaintiffs for this class (Barranca, Vigil, and Paiz) lack standing to pursue injunctive relief. It is undisputed that these three plaintiffs were housed in CRDF at the time plaintiffs moved to amend the complaint to add their claims for injunctive relief, a motion that was granted. (*See* Dkts. 43, 51, 56.) Defendants argue, however, that because they are no longer housed at CRDF, they face no imminent threat of future injury from the allegedly unconstitutional search procedures, and so lack Article III standing. This argument is foreclosed by *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). The Court must determine "whether the elements of Article III standing ... were satisfied at the time the complaint was filed." *Haro v. Sebelius*, 747 F.3d 1099, 1108, 2014 WL 21353, at *6 (9th Cir. Jan. 2, 2014) (citing *McLaughlin*, 500 U.S. at 51, 111 S.Ct. 1661). When the first amended complaint was filed, "plaintiffs' injury was at that moment capable of being redressed through injunctive relief."

*McLaughlin*, 500 U.S. at 51, 111 S.Ct. 1661. "[T]hat the claims of the named plaintiffs have since been rendered moot" does not deprive the Court of jurisdiction, and does not render the proposed representatives of the injunctive relief class inadequate. *Id.* at 51–52, 111 S.Ct. 1661; *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1092 (9th Cir. 2011) ("[I]f the district court certifies the class, certification relates back to the filing of the complaint. Once the class has been certified, the case may continue despite full satisfaction of the named plaintiff's individual claim because [relief for] the named plaintiff fails to satisfy the demands of the class.")

### C. Rule 23(b) Requirements

In addition to demonstrating that the prerequisites of Rule 23(a) have been met, plaintiffs bear the burden of showing that at least one requirement of Rule 23(b) has been met. Here, plaintiffs seek certification under both Rule 23(b)(2) and Rule 23(b)(3).

#### 1. Injunctive Relief Class

■ Under Rule 23(b)(2), a class action "may be maintained if Rule 23(a) is satisfied and if ... the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 2(b)(2). The rule was designed, among other things, "to permit the prosecution of civil rights actions." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir.1998). "Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Ellis*, 657 F.3d at 986 (citations and internal quotation marks omitted).

■ Defendants do not dispute that the *common* procedures described above apply generally to the class. To this extent, therefore, plaintiffs have satisfied their burden under Rule 23(b)(2). *Cf. Rodriguez v. Hayes*, 591 F.3d 1105, 1126 (9th Cir.2010) (certification under Rule 23(b)(2) proper where the "proposed members of the class each challenge [INS] practice of prolonged detention of detainees without providing a bond hearing and seek as relief a bond

hearing with the burden placed on the government"); *Walters*, 145 F.3d at 1047 (certification under Rule 23(b)(2) proper where plaintiffs challenged constitutionality of INS procedures in document fraud cases and "[t]he forms and procedures in question were used by the INS in document fraud cases on a nationwide basis"). Accordingly, the Court will certify plaintiff's proposed injunctive class and determine whether the common conditions of the strip searches conducted at CRDF render those searches unconstitutional.[6]

### 2. Damages Class

To obtain certification of a class under Rule 23(b)(3), plaintiffs must demonstrate that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). The rule "provides a non-exhaustive list of factors to consider in determining superiority." *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001). These factors are:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3). Here, the principle issue is the difficulty of managing the proposed class members' claims for emotional damages resulting from the allegedly unconstitutional searches they experienced.

▮ The questions of law and fact common to the determination of whether defendants are *liable* to the proposed class members for constitutional violations, based on the shared characteristics of the searches identified above, clearly predominate over any questions affecting only individual members. The issue of liability is readily resolved "in one stroke" for the reasons just discussed in connection with the injunctive relief class. But the proposed class members' claims also include damages allegedly caused by the federal constitutional violations. (*See* SAC ¶¶ 104–105, 107–108, p. 28.) The Supreme Court has made clear that the value of these damages cannot be determined in the abstract, but must be based on "proof of actual injury." *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 308, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). This is because "[t]he basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights." *Carey v. Piphus*, 435 U.S. 247, 254, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). "[D]amages for violations of constitutional rights are determined according to principles derived from the common law of torts." *Cummings v. Connell*, 402 F.3d 936, 942 (9th Cir.2005). Thus, compensatory damages for constitutional torts "may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation, and mental anguish and suffering." *Stachura*, 477 U.S. at 307, 106 S.Ct. 2537 (citation and internal quotation marks omitted); *Carey*, 435 U.S. at 263–64, 98 S.Ct. 1042 (recognizing possibility of emotional distress damages for constitutional torts).

▮ Defendants oppose plaintiffs' motion to certify a class under Rule 23(b)(3) on the ground that individualized damages assessments would substantially predominate over the common question of whether the strip searches were unconstitutional. "While the black letter rule is that individual damage calculations generally do not defeat a finding that common issues predominate, in particular cases, courts may examine whether individualized damage concerns are unusually

---

6. The common conditions are those described in Part II(B)(1)(a) of this order, and exclude the cleanliness of the floor, deputies' language, whether inmates were seen from outside the bus bay, occasions in which the order in which body cavities were probed departed from standard procedure, and whether inmates with disabilities received reasonable accommodations.

pertinent or unique." 2 William B. Rubenstein, *Newberg on Class Actions* § 4:54, at 208–209 (5th ed. 2012). It is no accident that this statement of the rule refers to "calculations." *See Klay v. Humana, Inc.,* 382 F.3d 1241, 1259–60 (11th Cir.2004) ("Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification.") (footnotes omitted). In the Ninth Circuit, the rule finds its original formulation in *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975), a securities fraud case. In affirming certification of a class of stock purchasers allegedly harmed by misrepresentations about the company's financial condition, the Court of Appeals observed that "[t]he amount of damages is invariably an individual question and does not defeat class action treatment." *Id.* at 905. The court explained that if the plaintiffs prevailed on their claims, "the amount of price inflation [caused by the defendants' misrepresentations] during the period can be charted and the process of computing individual damages will be *virtually a mechanical task.*" *Id.* (emphasis added). Subsequent opinions applying the *Blackie* rule typically involve damages that can be calculated using a formula that mechanically produces a numerical result on the basis of a limited set of precise data for each class member. *See, e.g., Abdullah v. U.S. Security Assocs., Inc.,* 731 F.3d 952, 966–67 (9th Cir.2013) (Rejecting defendant's predominance argument because "[i]n light of [defendant's time records], it would not be difficult to determine [defendant's] liability to individual plaintiffs [for failure to provide meal breaks], nor would it be overly-burdensome to calculate damages."); *Leyva v. Medline Industries Inc.,* 716 F.3d 510, 514 (9th Cir.2013) (Defendant's "computerized payroll and time-keeping database would enable the court to accurately calculate damages and related penalties for each claim ... [so that] damages could feasibly and efficiently be calculated once the common liability questions are adjudicated."); *Arthur Young & Co. v. U.S. Dist. Court,* 549 F.2d 686, 696 (9th Cir.1977) (After investment fraud claims are tried, "all that will remain is to determine the

amount invested and the interest bought by each claimant, then compute damages for each claimant."); *cf. Yokoyama v. Midland Nat. Life Ins. Co.,* 594 F.3d 1087, 1094 (9th Cir.2010) ("Damage calculations will doubtless have to be made under Hawaii's consumer protection laws" based on annuity purchasers' ages and the financial characteristics of the annuity, but "because the district court interpreted Hawaii law to require subjective reliance, it [incorrectly] concluded that the damages calculation involved highly individualized and fact-specific determinations.")

Apparently recognizing that assessing class members' actual damages (or "special damages") would be a highly individualized process, plaintiffs state that they "are not proposing class wide special damages." (Reply at 16.) Instead, plaintiffs propose two alternative ways to adjudicate damages. Their preferred solution would be award "general" or "presumed" damages to the class members. In the alternative, plaintiffs suggest that certification of the class could be limited to the issue of liability only, leaving individual damages determinations to subsequent proceedings. (Reply at 36.)

### (a) Presumed Damages

▮ Plaintiffs appeal to "the well-recognized rule that presumed or general damages (as opposed to special damages) may be compensated without individual inquiry." (Mot. at 36.) They argue that general damages "are a long recognized tool for compensating for a harm to dignity that is inherent in certain constitutional violations." (*Id.*) Plaintiffs cite as examples two district court decisions certifying damages classes for allegedly unconstitutional strip searches. *See Barnes v. District of Columbia,* 278 F.R.D. 14 (D.D.C.2011); *In re Nassau County Strip Search Cases,* No. 99–CV–3126 (DRH), 2008 WL 850268 (E.D.N.Y. March 27, 2008). These courts ruled that juries could hear testimony from a small subset of the class in order to determine general damages for every class member. *See Barnes,* 278 F.R.D. at 20 ("By 'general' damages, the Court means the injury to human dignity that is presumed when a person is strip searched or overdetained."); *Nassau County Cases,* 2008 WL 850268, at *6 ("There is no reason that a

jury in this case, hearing the procedures used by Defendants for strip searches together with the testimony of a number of class members as to the circumstance of actual searches, could not determine an amount of general damages awardable to each member of the class.").

Plaintiffs are correct that the concept of presumed damages has an ancient pedigree, but incorrect in concluding that its use is justified in class actions for § 1983 claims. The common law drew a distinction between the "general damages" and the "special damages" caused by a legal wrong. *See, e.g., Vanderslice v. Newton*, 4 N.Y. 130, 132 (1850). "Those which *necessarily* result from the injury are termed general damages," in contrast to special damages, which "are the natural, although not the necessary result of the injury." *Id.* Because general damages were presumed to result from the legal wrong, they did not need to be "specially" pleaded or proved. *Hogue–Kellogg Co. v. Baker*, 47 Cal.App. 247, 250–51, 190 P. 493 (1920). General damages were common in defamation actions, where it was held that "a plaintiff is entitled to general damages as compensation for those injuries which the law presumes must naturally and necessarily result from [a libelous] publication." *New York Evening Post Co. v. Chaloner*, 265 F. 204, 220 (2d Cir.1920).

More recently, however, the Supreme Court labeled the common law of defamation "an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The Court has neither ratified nor rejected the concept of presumed damages in § 1983 actions, but has placed limits on their use.[7] In *Carey v. Piphus*, the Court considered whether plaintiffs could recover substantial nonpunitive damages in a § 1983 action solely on the ground that their right to due process under the Fourteenth Amendment was violated, without having to prove any actual injury.

*Carey*, 435 U.S. at 252, 98 S.Ct. 1042. The plaintiffs were students who had been summarily suspended from school. The defendants did not dispute that the plaintiffs were denied due process, but argued that unless the plaintiffs could prove an actual injury resulting from the constitutional violation, they were entitled "at most to nominal damages." *Id.* at 251 n. 5 & 254, 98 S.Ct. 1042. The Supreme Court agreed. It explained that "damages awards under § 1983 should be governed by the principle of compensation" drawn from tort law. *Id.* at 258, 98 S.Ct. 1042. Recognizing that the common law of torts will in some cases "parallel closely the interests protected by particular constitutional right"—and in other cases fail to do so—the Court held that "the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question. . . ." *Id.* at 259, 98 S.Ct. 1042. The Court rejected the argument that "injury fairly may be 'presumed' to flow from every denial of procedural due process." *Id.* at 261, 98 S.Ct. 1042. It concluded that the policy considerations supporting the presumption of injury in defamation actions under the common law do not apply to deprivations of procedural due process. *Id.* at 262–63, 98 S.Ct. 1042.

In *Memphis Community School Dist. v. Stachura*, the Supreme Court considered the trial of a § 1983 claim in which the jurors were told to award damages based on the "value you place on [the] Constitutional right which you find was denied. . . ." *Stachura*, 477 U.S. at 303, 106 S.Ct. 2537. The Court reaffirmed its holding in *Carey* that ordinarily, damages in a § 1983 case are designed to provide compensation for the injury caused to the plaintiff by the defendant's violation of a constitutional right. *Id.* at 305–308, 106 S.Ct. 2537. Thus, "the abstract value of a constitutional right may not form the basis for § 1983 damages." *Id.* at 308, 106 S.Ct. 2537. It made no difference that the right at issue in *Stachura* was the substantive right

---

7. The term "presumed damages" is employed in this order because the term "general damages" has developed a broader and vaguer meaning. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 425–26, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (referring to all compensatory damages in contrast to punitive damages); *Phelps v. Stostad,* 16 Cal.4th 23, 27–28, 65 Cal. Rptr.2d 360, 939 P.2d 760 (1997) (referring to compensation for any non-economic injuries).

to freedom of speech under the First Amendment, in contrast to the procedural right at issue in *Carey.* *Id.* at 309, 106 S.Ct. 2537. "[W]hatever the constitutional basis for § 1983 liability, such damages must always be designed to *compensate injuries* caused by the constitutional deprivation." *Id.* (citation and internal quotation marks omitted). The Court also rejected the plaintiff's argument that the instruction legitimately authorized a form of "presumed damages," observing that "[p]resumed damages are a *substitute* for ordinary compensatory damages, not a *supplement* for an award that fully compensates the alleged injury." *Id.* at 310, 106 S.Ct. 2537.

In *Stachura,* the Court left open the possibility that "[w]hen a plaintiff seeks compensation for an injury that is likely to have occurred but difficult to establish, some form of presumed damages may possibly be appropriate." *Id.* at 310–11, 106 S.Ct. 2537 (citing defamation suits). "In those circumstances, presumed damages may roughly approximate the harm that the plaintiff suffered and thereby compensate for harms that may be impossible to measure." *Id.* at 311, 106 S.Ct. 2537. For example, older cases in which damages were awarded for violations of the right to vote appeared to involve "an award of presumed damages for a nonmonetary harm that cannot easily be quantified." *Id.* at 311 n. 14, 106 S.Ct. 2537 (citing *Nixon v. Herndon,* 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927) and *Lane v. Wilson,* 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939)). Nevertheless, the validity of presumed damages was not litigated in those cases. *See Lane,* 307 U.S. at 269–71, 59 S.Ct. 872; *Nixon,* 273 U.S. at 539–40, 47 S.Ct. 446. *Stachura* even casts some doubt on "the wisdom of these decisions in the context of the changing scope of compensatory damages over the course of this century...." *Id.*

Nor has the Ninth Circuit decided whether presumed damages are appropriate in § 1983 cases. In *Trevino v. Gates,* 99 F.3d 911 (9th Cir.1996), a wrongful death action based on a police shooting, the jury was instructed that it could award compensatory damages based on proof of the plaintiff's actual injury, or, if it found insufficient evidence of actual injury, it should award nominal damages based solely on the constitutional violation. *Id.* at 921. The jury awarded nominal damages, and on appeal the plaintiff argued that the jury should have been given the option to award presumed damages. *Id.* In rejecting this argument, the Court of Appeals cited *Carey* for the general proposition that "[p]resumed damages are appropriate when there is a great likelihood of injury coupled with great difficulty in proving damages." *Id.* at 921 (citing *Carey,* 435 U.S. at 264, 98 S.Ct. 1042). *Trevino* was not such a case, however. Because the plaintiff "ably presented evidence and argued to the jury she was entitled to compensatory damages for emotional and economic harm, ... a presumed damages instruction was not mandated." *Id.* at 922.

Nominal damages are an alternative way to "vindicat[e] deprivations of certain 'absolute' rights that are not shown to have caused actual injury...." *Carey,* 435 U.S. at 266, 98 S.Ct. 1042. "When a plaintiff alleges violation of a constitutional right, the Supreme Court has held that, even if compensatory damages are unavailable because the plaintiff has sustained no actual injury—such as an economic loss, damage to his reputation, or emotional distress—nominal damages are nonetheless available in order to 'make the deprivation of such right actionable' and to thereby acknowledge the 'importance to organized society that the right be scrupulously observed.'" *Jacobs v. Clark Cnty. Sch. Dist.,* 526 F.3d 419, 426 (9th Cir.2008) (quoting *Carey,* 435 U.S. at 266, 98 S.Ct. 1042) (internal brackets omitted). Nominal damages are different from presumed damages, however, because they do not compensate the plaintiff for an actual injury. *See Hazle v. Crofoot,* 727 F.3d 983, 992–93 (9th Cir.2013) (nominal damage awards provide insufficient compensation "for unlawful conduct resulting in the loss of liberty.").[8]

Unlike the Ninth Circuit, the Second Circuit has explicitly sanctioned the use of presumed damages as compensation for constitutional torts. *See Kerman v. City of New York,* 374 F.3d 93, 130 (2d Cir.2004). In *Kerman,* the plaintiff's Fourth Amendment

---

8. Plaintiffs have not asked for nominal damages.   (*See* SAC at 28.)

rights were violated when he was handcuffed and detained for psychiatric evaluation, but the jury only awarded him nominal damages. The Court of Appeals held that "where the jury has found a constitutional violation and there is no genuine dispute that the violation resulted in some injury to plaintiff, the plaintiff is entitled to an award of compensatory damages as a matter of law." *Id.* at 124. In this case, the jury should have been instructed "that if the jury found that [the defendant] detained Kerman and sent him to the hospital without probable cause, which necessarily curtailed Kerman's liberty, Kerman was, *independently of his claims of physical, mental, emotional, or economic injury*, entitled to be compensated for that loss of liberty." *Id.* at 128 (emphasis added).

The Ninth Circuit's recent opinion in *Hazle v. Crofoot* cited portions of *Kerman* with approval, but did not address *Kerman*'s theory that juries in § 1983 cases should be instructed that they may award presumed damages for constitutional violations. *See Hazle*, 727 F.3d at 992–93. In *Hazle*, the plaintiff sued his parole agent and other state officials for violating his First Amendment rights when they revoked his parole and sent him back to prison for refusing to participate in a religion-based drug treatment program. *Id.* at 986–87. The trial court found liability as matter of law and held a two-day jury trial on damages. Hazel based his claim for compensatory damages on evidence of his emotional distress and loss of liberty from being reincarcerated. *Id.* at 989. The jury awarded zero damages. The Court of Appeals explained that the jury's verdict was invalid "in light of proof of actual injury: Hazle's unlawful imprisonment because of his exercise of his First Amendment rights." *Id.* at 992. The court quoted *Kerman* for the proposition that " 'where the jury has found a constitutional violation and there is no genuine dispute that the violation resulted in some [actual] injury to plaintiff, the plaintiff is entitled to an award of compensatory dam-

ages as a matter of law.' " *Id.* at 992 (adding "[actual]" to the quotation from *Kerman*, 374 F.3d at 124). It was unnecessary to address *Kerman*'s theory of presumed damages, however, because Hazel had so obviously been injured by the violation of his religious freedom: he was incarcerated for being an atheist. For example, Hazel introduced evidence about prison conditions. *Id.* at 989. Thus, *Hazle* involved a concrete and ascertainable injury, not "an injury that is likely to have occurred but difficult to establish, [for which] some form of presumed damages may possibly be appropriate." *Stachura*, 477 U.S. at 310–11, 106 S.Ct. 2537.

As in *Hazel*, if the individual plaintiffs' claims in this case were tried separately, it would not be necessary to employ the concept of "presumed damages." If a plaintiff successfully established that the manner in which she was searched was unconstitutionally "invasiv[e]" or "abusive," *Florence v. Board of Chosen Freeholders of County of Burlington*, —— U.S. ——, 132 S.Ct. 1510, 1523, 182 L.Ed.2d 566 (2012), then the jury would have concrete evidence about how that particular search was conducted. The jury could then assess compensatory damages on the basis of this evidence together with the plaintiff's testimony about her physical or emotional injuries. *See, e.g., Hazle*, 727 F.3d at 989–92; *Trevino*, 99 F.3d at 921–22. Plaintiffs' declarations demonstrate that there is no need to *presume* injury, because the declarants explicitly describe the emotional, physical, and mental anguish they suffered.[9] Under these circumstances, it would be inappropriate to instruct a jury that it could award "presumed damages" to *"roughly approximate* the harm that the plaintiff suffered and thereby compensate for harms that may be impossible to measure." *Stachura*, 477 U.S. at 311, 106 S.Ct. 2537 (emphasis added). Plaintiffs' injuries are not "difficult to establish." *Id.* This is not a case, therefore, in which "some form of presumed

---

9. *See, e.g.,* Ex. 802 ("I'm very angry after every search ... headache ... embarrassed."); Ex. 814 ("[I felt] sick to my stomach."); Ex. 816 ("I felt disrespected."); Ex. 839 ("Most times I buried my feelings. I became numb to seeing naked bodies all the time.... But the one time when the cop talked about my vagina ... was so hurt-

ful."); Ex. 868 ("I cried a lot."); Ex. 874 ("I just wanted to die. I'm suicidal and would rather be dead than to be treated like that."); Ex. 900 ("[I] felt dirty and that I was not worth anything."); Ex. 933 ("I always end up with tears in my eyes ... [and] I get nightmares.").

damages may possibly be appropriate." *Id.; Trevino*, 99 F.3d at 921; *accord Norwood v. Bain*, 143 F.3d 843, 856 (4th Cir.1998) (No need for presumed damages in class action where "[t]here was no inherent difficulty in proving any economic or physical or emotional harm that may have resulted [from the illegal search of the plaintiffs' personal property] or in quantifying the amount of that harm under established damages law."), *affirmed in relevant part on reh'g en banc*, 166 F.3d 243 (4th Cir.1999); *Baumgardner v. H.U.D.*, 960 F.2d 572, 581–83 (6th Cir.1992) (no need to presume damages where plaintiff presented evidence of emotional distress); *Lewis v. Harrison Sch. Dist. No. 1*, 805 F.2d 310, 317–18 (8th Cir.1986) ("Any door left open [for presumed damage awards] by [*Stachura* ] is not for plaintiffs like Lewis, whose damages are readily measurable.")

Despite the availability of evidence of actual injuries, plaintiffs propose to recover only presumed damages and forego any classwide claims for "special damages." (Reply at 16.) If a fixed value could be assigned to the injuries resulting from every unconstitutionally abusive strip search, then common questions surely would predominate over individual questions. To obtain class certification, therefore, plaintiffs would impose an artificial homogeneity on the complex facts. This is Rule 23 in reverse. Instead of asking whether common questions predominate over individual ones so that a class action would be superior to individual litigation, as required by Rule 23(b)(3), plaintiffs assume that a class action is superior, and then frame the question of damages so that it smooths over all factual variation, thereby eliminating individual questions from the predominance inquiry. *Cf. Wal–Mart*, 131 S.Ct. at 2559 (named plaintiffs' decision not to seek compensatory damages "place[d] at risk potentially valid claims for monetary relief" and "made it more likely that monetary relief would not 'predominate' [over injunctive relief]" for purposes of certification under Rule 23(b)(2)).

Plaintiffs further propose that if this case does not settle after certification of a damages class, then "general damages would be tried class wide, and individual plaintiffs could file for individual damages if they so choose." (Reply at 16–17.) This would unfairly expose defendants to duplicative damage awards, and violate the rule that "[p]resumed damages are a *substitute* for ordinary compensatory damages, not a *supplement* for an award that fully compensates the alleged injury." *Stachura*, 477 U.S. at 310, 106 S.Ct. 2537. This flawed proposal reveals the problem inherent in plaintiffs' argument for certification of a damages class. If the "presumed damages" uniformly awarded for every unconstitutional search would be inadequate compensation for the actual injuries suffered by all class members, then individual questions about damages would remain unresolved following resolution of the class-wide issues. This confirms that on the issue of damages for the physical and emotional pain and suffering caused by the strip searches conducted at CRDF, common questions do not in fact predominate over individual questions.

The two district court decisions cited by plaintiffs are not persuasive. The *Nassau County Strip Search Cases*, which predated *Florence*, concerned a blanket strip search policy at a county jail. The plaintiffs claimed a common "injury to human dignity" from the allegedly unconstitutional visual body cavity searches.[10] *See Nassau County Cases*, 2008 WL 850268, at *1, 3. The claims were not predicated on particular facts about the conditions under which the searches were conducted. *See In re Nassau County Strip Search Cases*, 742 F.Supp.2d 304, 322 (E.D.N.Y.2010) (subsequent proceedings). Because the district court was in the Second Circuit, it relied on *Kerman* to conclude that a presumed damages award was warranted for the "dignitary harm" caused by the searches. *Nassau County Cases*, 2008 WL 850268, at *4–6. The court observed that prior judicial opinions describing " 'the violative quality of unlawful strip searches were offered without specific references to the

10. The New York district court recently reversed its finding of liability under § 1983 for the blanket search policy in light of *Florence*. *In re*

*Nassau County Strip Search Cases*, 958 F.Supp.2d 339, 353–54 (E.D.N.Y.2013).

plaintiffs' testimony about their experiences; rather, the courts spoke to the common nature of the harm caused by strip searches.'" *Id.* at *6 (quoting plaintiff's argument with approval). The court then extended this reasoning to class actions, relying on a Second Circuit case approving of class-wide monetary relief for a Rule 23(b)(2) class in an employment discrimination lawsuit. *Id.* at 6 (citing *Robinson v. Metro–North,* 267 F.3d 147, 161 n. 6 (2d Cir.2001)). This precedent is no longer valid. *See WalMart,* 131 S.Ct. at 2560 (disapproving of "Trial by Formula" because defendant was "entitled to individualized determinations of each employee's eligibility for backpay"); *Jermyn v. Best Buy Stores, L.P.,* 276 F.R.D. 167, 173 (discussing *Wal–Mart*'s abrogation of *Robinson* ).

Likewise, the District of Columbia court's decision in *Barnes* pre-dates both *Florence* and *Wal–Mart,* and makes similar assumptions about the propriety of presumed damages for constitutional torts. *See Barnes,* 278 F.R.D. at 20 ("By 'general' damages, the Court means the injury to human dignity that is presumed when a person is strip searched. . . ."). Recognizing that class treatment was inappropriate for the plaintiffs' separate claims for special damages including emotional distress, the court limited certification to the issue of general damages. *Id.* at 22 (Because not all members of class "will have been impacted in the same way, because of differences in those experiences as well as differences in class members' backgrounds and personal characteristics, questions affecting individual members of the class will necessarily predominate over any questions of law or fact common to the class.")

This is a case about the *manner and conditions* under which otherwise presumptively valid strip searches were conducted. If the searches were conducted in a manner that violates the Constitution, then presumed damages would not be an adequate substitute for the class members' compensatory damages, which could readily be established on an individual basis through testimony. For this reason, plaintiffs have failed to establish that a class should be certified under Rule 23(b)(3) for the purpose of determining liability and damages.

### (b) Certification Solely on Issue of Liability

As an alternative, plaintiffs suggest that the Court could certify a Rule 12(b)(3) class solely on the issue of liability, leaving individual damage determinations to subsequent separate proceedings. Federal Rule of Civil Procedure 23(c)(4) provides: "When appropriate, an action may be brought or maintained as a class action with respect to particular issues." The Supreme Court has yet to decide whether this provision permits a court to certify a class under Rule 23(b)(3) only on particular issues. Professor Rubenstein has observed that "courts and commentators are sharply split on when issue certification is proper under Rule 23(c)(4)." 2 Rubenstein § 4:91, at 381–82 (footnote omitted). The Fifth Circuit has rejected the use of the rule to "manufacture predominance" where it is otherwise absent. *Castano v. American Tobacco Co.,* 84 F.3d 734, 745 n. 1 (5th Cir.1996). "Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended." *Id.* But the Second Circuit has argued that "the Fifth Circuit's view renders subsection (c)(4) virtually null. . . ." *In re Nassau County Strip Search Cases,* 461 F.3d 219, 226 (2d Cir.2006). The Second Circuit therefore takes the opposite position, holding that "a court may employ subsection (c)(4) to certify a class as to liability regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement." *Id.* at 227.

Professor Rubenstein reports that the Ninth Circuit is the only other circuit to have take an explicit position on the viability of "issue classes." 2 Rubenstein § 4:91, at 382 (citing *Valentino v. Carter–Wallace, Inc.,* 97

F.3d 1227, 1234 (9th Cir.1996)). In *Valentino,* the Court of Appeals reversed a district court's certification of a nationwide class of people who had used an anti-epilepsy drug. The court found the certification order "brief and conclusory," observing that it was "entered with the express hope on the part of the district judge of encouraging settlement....." *Id.* at 1234. The record did not show that "some key requirements of Rule 23 have been satisfied," namely, typicality, adequacy, and commonality. *Id.* In describing the commonality requirement, the Court of Appeals cited its 1982 opinion in *In re N. Dist of Cal., Dalkon Shield IUD Products Liab. Litig.,* 693 F.2d 847, 856 (9th Cir.1982). In that opinion, which also denied certification of a nationwide class in a products liability action, the Court of Appeals observed in the course of describing the superiority requirement that "[a] trial court can sever and try only certain issues on a class basis under Rule 23(c)(4)(A)." *Id.* at 856. Citing this statement and the views of commentators, *Valentino* explained:

> Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues.

*Valentino,* 97 F.3d at 1234. The court did not explain which cases might be "appropriate cases" for severance of particular issues. It was unnecessary to address this question in view of the numerous "deficiencies in this certification [order]." *See id.* at 1234–35. The Court of Appeals concluded that "the district court abused its discretion by certifying particular issues for class adjudication." *Id.* at 1234.

In view of the context in which *Valentino* described "issue classes"—in an opinion ultimately rejecting the district court's certification order for a variety of reasons—Professor Rubenstein observes that the Ninth Circuit's description of the role of Rule 23(c)(4) is dicta. 2 Rubenstein § 4:91, at

381 n. 5. Even as dicta, however, the panel's endorsement of the use of issue classes is instructive to a district court in this circuit. *See Barapind v. Enomoto,* 400 F.3d 744, 750–51 (9th Cir.2005) (en banc); *Cetacean Community v. Bush,* 386 F.3d 1169, 1173 (9th Cir.2004) ("The line [between dicta and holdings] is not always easy to draw, however, for 'where a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense.'") (quoting *United States v. Johnson,* 256 F.3d 895, 914 (9th Cir.2001) (Kozinski, J., concurring)). Other Ninth Circuit panels have subsequently endorsed "using Rule 23(c)(4) to certify specific issues under the Rule 23(b)(2) standard." *Sepulveda v. Wal–Mart Stores, Inc.,* 464 Fed. Appx. 636, 637 (9th Cir.2011) (unpublished) (observing that in previous order remanding case to district court "we instructed the district court to reconsider, in the alternative, using Rule 23(c)(4) ...."); *see also Dukes v. Wal–Mart Stores, Inc.,* 603 F.3d 571, 620 n. 43 (9th Cir.2010) (en banc) ("Relying on Rule 23(c)(4), our own precedent also generally allows class treatment of common issues even when not all issues may be treated on a class basis.") (citing *Valentino* and the Second Circuit's opinion in the Nassau County strip search cases), *reversed on other grounds by Wal–Mart,* 131 S.Ct. 2541.

Assuming that in the Ninth Circuit, the Second Circuit's endorsement of issue classes will prevail over the Fifth Circuit's contrary view, plaintiffs nevertheless have failed to satisfy their burden of demonstrating that a class action on the issue of liability alone will be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3); *Valentino,* 97 F.3d at 1234–35 ("A class action is the superior method for managing litigation if no realistic alternative exists."). In this case, separate trials are a realistic and superior alternative to a class that is limited to the issue of liability. In separate

trials, each plaintiff would be able to present evidence not just about the conditions common to all searches at CRDF, but about the individual characteristics of the searches she personally experienced, including evidence of unsanitary conditions or search methods, whether she had a disability and whether it was accommodated, whether men outside the bus bay saw her, and whether deputies were physically abusive or used demeaning language. Thus, at an individual trial, there would potentially be more evidence supporting the plaintiff's contention that the searches she endured were conducted in an unconstitutionally invasive or abusive manner than there would be if the liability determination were based solely on the common conditions of the searches. There would also be more evidence supporting emotional distress damages.

In contrast, certification of a class on the issue of liability alone would entail first holding a trial on whether the common characteristics of the searches renders them unconstitutional, and then, if the Court found liability, proceeding with potentially thousands of jury trials. At each such trial, evidence concerning the uncommon conditions experienced by the plaintiff would be inadmissible, since the question of liability would already have been established on the basis of the common evidence. The only question for the jury would be the extent of the class member's damages that are attributable to those unconstitutional common conditions. Emotional distress resulting from abusive behavior or demeaning language by deputies, for example, would not be recoverable, since the sporadic occurrence of these acts contrary to LASD policy would not have been a part of the factual basis for the prior classwide finding of liability. With issue certification, therefore, both the evidence of liability and the evidence of damages would be more limited than in separate trials.

Plaintiffs have submitted neither evidence nor argument indicating that the potential recoveries available to class members in individual lawsuits are insufficient to create an incentive to litigate their claims. A plaintiff in a § 1983 case is entitled to recover attorneys' fees even if the jury awards only nominal damages for the constitutional violation. 42 U.S.C. § 1988; *Farrar v. Hobby,* 506 U.S. 103, 112, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); *Cummings v. Connell,* 402 F.3d 936, 946 (9th Cir.2005). Moreover, under count five of the complaint, each plaintiff would be entitled to "a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto...." Cal. Civil Code § 52(a); (*see* SAC ¶¶ 117–21).

In view of the need for individual trials on damages regardless of whether an issue class on liability is certified, it appears that "the time saved by a class action" would be "relatively insignificant" in this case. *Dalkon Shield,* 693 F.2d at 856. In contrast, with individual lawsuits, "[a] few verdicts followed by settlements might be equally efficacious." *Id.*

The parties briefed the issue of superiority on the assumption that all of plaintiffs' allegations about the conditions of the strip searches would be part of the common question for classwide resolution. For this reason, the parties have not addressed the different question of whether a class action on liability only (where the issue to be resolved is limited to the common conditions of all CRDF strip searches) would be superior to individual actions (in which all of plaintiffs' allegations about the searches could be litigated regardless of whether the conditions of every search are uniform). Accordingly, plaintiffs will be given an opportunity to argue that even with the common question framed more narrowly than they originally proposed, a class action on the issue of liability alone would be superior to individual litigation.

## IV. ORDER

For the foregoing reasons, plaintiffs' motion for class certification is hereby GRANTED in part and DENIED in part, as follows:

(1) Pursuant to Federal Rule of Civil Procedure 23(b)(2), the Court certifies a class of

all present or future women inmates of the Los Angeles County Jail who, upon their admission or return to the Century Regional Detention Facility from outside of the facility, are being or will be subjected to a visual body cavity search in a group with other inmates in an outside bus stall.

(2) In all other respects, plaintiffs' motion for class certification is DENIED without prejudice to a motion to certify a Rule 23(b)(3) class on the issue of liability only based on a showing of superiority.

(3) The parties shall appear for a status conference on March 31, 2014, at 1:30 p.m. to discuss setting a trial date for the injunctive class claims. However, if plaintiffs intend to file a renewed motion for certification of a damages class on the issue of liability, they shall so notify the Clerk in writing not later than March 27, 2014, and the status conference will be vacated.

(4) A renewed motion to certify a damages class on the issue of liability pursuant to Rule 23(c)(4), if any, shall be filed not later than April 14, 2014, and noticed for hearing in accordance with Local Rule 6-1. Any such motion shall address the question of superiority but need not address the other requirements for certifying an issue class.

IT IS SO ORDERED.